**Mary McBRIDE, Appellant–
Respondent,**

v.

**MONROE COUNTY OFFICE OF
FAMILY AND CHILDREN,
Appellee–Petitioner.**

No. 53A05–0212–JV–629.

Court of Appeals of Indiana.

July 7, 2003.

Publication Ordered Sept. 8, 2003.

Earl R.C. Singleton, Bloomington, IN, Attorney for Appellant.

Stephen Ross Galvin, Monroe County Office of Family and Children, Bloomington, IN, Attorneys for Appellees.

Michael Carmin, Court Appointed Special Advocate, Bloomington, IN, Attorney for Dr. Lourdes Heumann.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Mary McBride appeals the termination of her parental rights as to three of her children, Z.M., S.M. and M.M., and presents the following issues on appeal:

1. Whether the trial court's order of termination should be reversed because of alleged procedural deficiencies in the Child in Need of Services ("CHINS") proceedings.

2. Whether the Monroe County Office of Family and Children ("OFC") presented sufficient evidence to support the trial court's termination of McBride's parental rights.

We affirm.

### FACTS AND PROCEDURAL HISTORY

In 1988, McBride married Gordon Scott Feaster, and three children were born during their marriage, C.F., K.F., and J.F. ("Feaster children").[1] McBride and Feaster divorced in 1991, and McBride was granted custody of the Feaster children. The following year, McBride married William McBride ("William"). McBride gave birth to Z.M. in 1993 and S.M. in 1994. In late 1994, McBride and

---

1. The Feaster children are not involved in the instant termination proceeding.

William moved to Georgia with the Feaster children, Z.M., and S.M.

On March 9, 1995, McBride was arrested for writing bad checks, and Georgia child protective services removed all five children from McBride and placed them in foster care. The Feaster children were eventually removed from foster care and returned to their biological father's custody in Indiana. Z.M. and S.M., however, remained in foster care in Georgia.

McBride was released from jail in April 1995. She and William lived in a motel for a brief period of time and then lived in a car. McBride and William continued to write bad checks, and McBride was again arrested in October 1995. Upon her release in January 1996, she and William moved to a new city in Georgia. In April 1996, Georgia child protective services returned Z.M. and S.M. to McBride's custody, and in August, 1996, child protective services dismissed the pending juvenile proceedings.

Thereafter, McBride and William lived with the two children in a trailer. McBride worked second shift at a convenience store and gas station. She walked to and from work, and left the children with William while she worked. On February 11, 1997, Georgia law enforcement officers removed Z.M. and S.M. from the home "due to concerns for their safety." Specifically, according to juvenile court documents:

> [The children] were living in a dilapidated mobile home without heat or electrical power except that which was supplied through an extension cord from a neighbor's home. There was no stove or refrigerator in the home. The family had been in the home since about December 10, 1996, without heat, refrigeration, stove or power. In addition, the home was very cluttered and dirty. The responding officer observed spoiled food

sitting out, numerous beer cans and piles of dirty clothes. Extension cords were snaked throughout the trailer.

> When the children were examined, both were found to have linear bruising on their legs and buttocks. The oldest child related that the father had hit her on her legs, bottom and "pee-pee" with a paddle.

> This is the second occasion where these children have been removed from the parents at least partially due to neglect.

The State of Georgia charged McBride and William with Cruelty to Children. McBride pleaded guilty and was sentenced to serve thirty-one days in boot camp, along with ten years' probation. William pleaded guilty to three counts of Cruelty to Children, two of which alleged that he caused bruising on and pain to the children, and was sentenced to up to 120 days in jail and seven years' probation. Again, Z.M. and S.M. were placed in foster care.

McBride was released from jail in July 1997 and gave birth to her third child with William, M.M., one month later. When William was released from jail in September 1997, he moved in with McBride and their infant. McBride allowed William to live in her home even though he had recently admitted to beating their other two children. In February 1998, William threw a beer bottle at McBride and hit her in the face. McBride told police that William did not mean to hit her, but William was nevertheless arrested for battery. The Georgia court revoked a portion of William's probation on his Cruelty to Children convictions and ordered that he have no contact with McBride. Approximately one month later, M.M. was removed from McBride's custody and placed in foster care with Z.M. and S.M. McBride failed to visit with her children during this time, and she admitted that she was not follow-

ing the requirements of the Georgia child protective services' case plan.

In July 1998, McBride moved back to Indiana and lived in Kokomo for a brief period. Next, she moved to Bedford, where she enrolled in a domestic violence program. She then moved to Bloomington and lived at the Rise, a transitional housing facility for victims of domestic violence and their children. McBride resided at the Rise for one year and four months and was offered comprehensive services. Given that Z.M., S.M. and M.M. were still in foster care in Georgia, McBride did not visit with her children on a regular basis during that time.

In May 1999, McBride attended a hearing in Georgia regarding her children. The Georgia juvenile court officials had recommended that her parental rights with respect to Z.M., S.M. and M.M. be terminated. Pursuant to that recommendation, Greg Edie, a caseworker with OFC, conducted a home study for the Georgia officials. Edie prepared a seven-page report, which provided in relevant part:

> [McBride] was unable to meet the reunification efforts provided in Georgia when it would have been best for the children to be united with their mother. Mary moved up here to meet her needs and not the needs of her younger children. Mary minimizes the importance of the one-on-one contact with her children. Mary loves her children, stays in phone contact and occasionally sends videos, but none of this can replace the one-on-one contact that is so crucial to children at this age. The time that Mary lived in Georgia[ ] is the time and opportunity that she should have used to regain her children, because this would have been the least traumatic for these young children.

> I feel the only thing that has really changed since Mary moved to Indiana is her address, increased visitation with her older children [the Feaster children], decreased visitation with her younger children and she has started her college career. I don't see how this move has benefited her younger children. Yes, she has had contacts with the children, but not the kind of contact that is required for this age of child to have a strong bond with their mother. I realize that it may have been more difficult for her to live in Georgia than here in Indiana where she has more support, but it has been more difficult for her children to be in foster care without their mother when they need her support. It seems that it is the parent that must continue to make the sacrifices necessary to be reunited with their children and not the children themselves.

> [OFC] does not recommend the placement of [Z.M., S.M. and M.M.] with their mother [McBride].

Following a hearing, and despite OFC's recommendation, the Georgia court ordered that Z.M., S.M. and M.M. be returned to McBride's care and custody in Indiana. The court based its order, in part, on the fact that McBride had secured a safe living environment for the children at the Rise, in addition to her representation to the court that she was separated from and in the process of divorcing William, who the court noted "has caused great harm toward the children" in the past. McBride did not inform the Georgia court during the hearing that while living at the Rise, she had accepted collect telephone calls which cost approximately $1000 from William while he was incarcerated. The Feaster children were also subsequently returned to McBride's care in May 1999. In January 2000, McBride's divorce from William became final.

McBride left the Rise in early 2000. When William was released from prison in June 2000, McBride picked him up in Indianapolis and brought him to Bloomington. William stayed at McBride's house, and she never informed the Georgia court that she was having contact with William. In January 2001, William hit McBride in front of one of the children. McBride then sought a protective order, but later stated that she was pressured into seeking a protective order by Dagnia Feaster, the Feaster children's paternal step-grandmother.

In May 2001, William argued with and threatened McBride at her home while the children were present. McBride left the home with the children but did not believe that William was a danger to the children. Following this incident, Z.M., S.M., M.M. and the Feaster children were removed from McBride's care pursuant to an emergency order issued by the Monroe Circuit Court. The Feaster children went to live with relatives, and Z.M., S.M. and M.M. were placed in foster care with Tonya and Tim Ferguson, where they remained throughout the subsequent termination proceedings.

On June 20, 2001, McBride appeared with counsel for the initial CHINS detention hearing in Monroe County. On July 26, 2001, Michelle Fields, OFC caseworker, met with McBride and her attorney and provided them a copy of a draft case plan. Under the plan, OFC recommended that McBride be evaluated by Dr. Susan Rautio–Dietz, but McBride and her attorney disputed that requirement because McBride had been previously evaluated for purposes of receiving social security bene-

fits. In addition, McBride and her attorney told Fields that McBride had been coerced into getting a protective order against William and that they did not believe that he was a danger to the children or McBride. McBride did not sign OFC's case plan until four months later in November 2001, just after she admitted that the children were CHINS as alleged in OFC's amended CHINS petition.[2] And because McBride would not admit that William was a danger to her children, in June 2001, OFC sought and received a protective order against William on behalf of Z.M., S.M. and M.M.

Following the CHINS dispositional hearing, in December 2001 the court issued an Order on Review/Dispositional Hearing, wherein it adopted OFC's recommendations contained in the Juvenile Predispositional Report and Six–Month Periodic Review Report and made those recommendations part of the court's order. Accordingly, the court ordered McBride to: (1) work with service providers to develop a safety plan in the event William attempted to make contact with her and/or her children; (2) permit service providers and OFC to make announced and unannounced visits to assure that William is not living, staying, or maintaining contact with the family; (3) maintain regular visitation with her children; (4) actively participate in individual and family counseling and follow recommendations made by therapists; (5) advise OFC of any household changes; (6) complete a psychological evaluation with Dr. Susan Rautio–Dietz and follow any recommendations; (7) comply with the terms of her probation; and (8) reimburse OFC for

**2.** OFC's amended CHINS petition alleged in relevant part that:

William McBride has a history of abusing his children, his wife's children by a prior marriage, and his wife. Mary McBride is

aware of the danger that William McBride poses to the children and to herself. Ms. McBride refuses to prohibit contact between the children and Mr. McBride.

the support of her children. OFC's original Recommendations and Treatment Plan contained a condition that McBride have no contact with William. However, because McBride objected to that condition, OFC struck it and, accordingly, it was not part of the court's CHINS dispositional order.

In January 2002, the court appointed Dr. Lourdes Heumann to serve as a Court Appointed Special Advocate ("CASA") for the children. OFC filed its Verified Petition for Termination of Parental Rights in July 2002, and the court conducted an evidentiary hearing on the petition in October 2002.[3] During that hearing, OFC presented testimony from persons familiar with McBride and her children, including Greg Edie and Michelle Fields, McBride's OFC caseworkers; Carole Gore, a social worker who supervised McBride's visitation with her children; Dr. Rautio–Dietz, a psychologist who performed a psychological evaluation of McBride; Dr. Heumann, the children's CASA; and Tonya Ferguson, the children's foster mother.

Specifically, Carole Gore explained that the children had told her about being beaten by William and that McBride had accused her children of lying about the alleged abuse. Although McBride visited with her children on a regular basis and would notify Gore when she would miss a visit, Gore also stated that McBride had requested that the court drop the protective order against William and that she be allowed to see him.

Additionally, Michelle Fields testified that not only did McBride insist upon being able to maintain contact with William, but she also failed to work with service providers to develop a safety plan as required by the court. Fields stated further that McBride did not participate in individual and family counseling and follow all recommendations. In particular, McBride began counseling at the Center for Behavioral Health and met with a caseworker there on four occasions. However, she stopped attending counseling when she received a bill she could not pay and waited two months to inform her OFC caseworker. In addition, she failed to schedule her appointment with Dr. Rautio–Dietz in a timely manner. When asked whether she believed termination of McBride's parental rights was in the children's best interests, Fields stated "Yes," and explained in part:

> Because [the children] have been in [foster] care for most of their lives, over half of their lives. They have currently been in placement for about sixteen months. I don't see that this pattern of abuse in mom going back to an abuser, whether it be William, or somebody else is going to change ... I have no evidence that ... she's made any real attempt. In regard to following the case plan, specifically initiating anything with counseling to where she is demonstrating a vested interest.... I know the kids need permanency....

Dr. Rautio–Dietz testified that she has diagnosed McBride with a severe posttraumatic stress disorder, depressive disorder, disassociative disorder, and dependent personality disorder. Dr. Rautio–Dietz stated that it could take several years of therapy for McBride to resolve her problems and characterized the therapy process for McBride's disorders as "very slow work." For example, she explained that, assuming McBride was motivated to improve her condition, it may take six months to show signs of progress.

**3.** Although none of the parties provided this court with a copy of the termination petition, the record reveals that OFC sought to terminate both McBride and William's parental rights. However, only McBride appealed the court's order of termination.

Moreover, she stated that relapse is common with McBride's condition and that, if she did relapse, it could have "fatal consequences." Dr. Rautio–Dietz testified that she would not recommend returning the children to McBride's care until she could be absolutely certain that McBride was not going to relapse and that, in her opinion, McBride has been placing her needs before the needs of her children. During questioning by the court, Dr. Rautio–Dietz reiterated that if McBride was going to benefit from therapy, it would be over an extended period of time and would require that McBride be motivated to actively participate in therapy. The court asked Dr. Rautio–Dietz about McBride's competence to make decisions for herself, and the doctor explained that McBride's judgment is "very poor," but she is not incompetent. When the court inquired why McBride would "not be able to do something as simple as make an appointment and go for therapy," Dr. Rautio–Dietz replied that McBride would have to want to schedule the therapy appointment.

Dr. Lourdes Heumann, the CASA, is a board-certified pediatrician and also testified at the termination hearing. Dr. Heumann spent over two hundred hours on this case. In her opinion, termination of McBride's parental rights is in the children's best interest. In particular, she explained:

> [F]or the last seven and [one-]half years Mary has been making decisions which endanger her children. There've been four removals, there've been multiple mental health evaluations, extensive services, and this endangerment, I just don't see it changing. The girls need permanency, and permanency is ready and waiting for them.

When OFC asked about the children's need for permanency, Dr. Heumann explained:

> Well, [Z.M. and S.M.] have been removed from their parents three times, and little [M.M.] has been removed two times. [Z.M.] is nine and she [has] been in and out of the system for over seven years, and that is over seventy five percent of her life, for the oldest one. Now, the younger two [have] been a lot more than that. Between the three of them they have lived in nine foster homes and one shelter. Mom knew this was her last chance, she knew it hinged on her decision to see William. The girls know their mother chose to see William, even knowing that she wasn't suppose to. They don't feel safe with their mother, they don't trust their mother. They have now been in the Ferguson['s] home for sixteen months and they've never before lived in one place for so long. I am concerned if we move them from this pre-adoptive home we better be one hundred percent sure that there is not going to be another removal, a fifth time.

The trial court issued its order terminating McBride's parental rights as to Z.M., S.M. and M.M. on November 8, 2002, and entered findings and conclusions sua sponte in support of its order. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Alleged Procedural Defects in CHINS Proceedings

McBride first asserts that the trial court's decision to terminate her parental rights should be reversed because of alleged procedural irregularities in the CHINS proceedings. Specifically, she complains of the following: (1) OFC did not complete a case plan within the statutorily required period; (2) the trial court's findings entered pursuant to its CHINS dispositional decree did not comply with

194

statutory requirements; (3) the trial court's findings entered pursuant to the periodic review hearings did not comply with statutory requirements; and (4) the trial court did not enter adequate findings or hold a permanency hearing within the statutorily required period. McBride claims that those irregularities deprived her of procedural due process guaranteed by the Due Process Clause of the United States Constitution and renders the termination decision void. Appellees respond that McBride has waived her due process challenge because, despite being represented by counsel throughout both the CHINS and termination proceedings, she failed to object to the alleged errors during the CHINS proceeding and did not raise her due process claim to the trial court at the termination stage. Appellees assert, in the alternative, that any alleged deficiencies in this case do not rise to the level of a due process violation.

■ The Fourteenth Amendment to the United States Constitution provides that "no person shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. XIV. As we explained in *A.P. v. Porter County Office of Family & Children,* 734 N.E.2d 1107, 1112 (Ind.Ct.App.2000), *trans. denied:*

> The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed. Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. A case involving the State's authority to permanently sever a parent-child bond demands the close consider-

ation the Supreme Court has long required when a family association so undeniably important is at stake.

(Citations omitted). Accordingly, a parent's right to raise one's children is protected by the Due Process Clause. *See In re A.H.,* 751 N.E.2d 690, 701 (Ind.Ct.App. 2001) (addressing due process claim on appeal from CHINS disposition), *trans. denied.*

■ It is well established, however, that a party on appeal may waive a constitutional claim. In particular, in *In re K.S.,* 750 N.E.2d 832, 834 n. 1 (Ind.Ct.App.2001), this court determined that a mother waived her claim that the trial court had violated her due process rights because of the court's alleged non-compliance with statutory requirements governing pre-termination proceedings, namely, a permanency hearing, case plan, and dispositional order, because she raised the constitutional claim for the first time on appeal. Similarly, in *Smith v. Marion County Dept. of Public Welfare,* 635 N.E.2d 1144, 1148 (Ind.Ct.App.1994), *trans. denied,* we held that a father waived his claim that he had a constitutional right to appointed counsel during a CHINS proceeding because he presented the issue for the first time on appeal. These cases comport with the general rule that an issue cannot be raised for the first time on appeal. *See State v. Friedel,* 714 N.E.2d 1231, 1236 (Ind.Ct. App.1999) (holding State waived claim that defendant lacked standing to challenge constitutionality of search due to failure to raise claim to trial court).

■ Here, McBride did not object to any of the alleged deficiencies in the CHINS process during the CHINS proceedings, nor did she argue during the termination proceedings that those alleged deficiencies constitute a due process violation. Rather, she has raised her procedural due process claim for the first time on

appeal. We, therefore, agree with Appellees that McBride has waived her constitutional challenge.[4]

Moreover, McBride's assertion that the termination decision should be voided because of alleged procedural deficiencies in the CHINS proceeding lacks merit. This court explained the relationship between CHINS and termination proceedings in *A.P.*, 734 N.E.2d at 1112–13:

> [P]rocedural irregularities in a CHINS proceedings may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. It would be incongruous to hold that a county, with the assistance of a juvenile court, may commence CHINS proceedings for a child and remove a child from his or her home, yet disregard various portions of the CHINS and termination statutes on several occasions and still terminate parental rights following the passage of time after a CHINS dispositional decree and a child's removal from the home.

In that case, we analyzed "a record replete with procedural irregularities throughout the CHINS and termination proceedings that [were] plain, numerous, and substantial." *Id.* at 1118. In particular, we discussed a total of seven substantial irregularities which, taken together, required reversal of the trial court's termination decision as a violation of procedural due process. *Id.* at 1117.[5] Additionally, we noted that we were not convinced that any one of the seven deficiencies, standing alone, would have resulted in a due process violation. *Id.* at 1118.

Unlike in *A.P.*, the procedural deficiencies McBride alleges do not rise to the level of a constitutional violation. For example, in *A.P.*, 734 N.E.2d at 1114, OFC failed to provide the parents with copies of some, and possibly all, of the case plans, which we found problematic because the parents "may have been deprived of some degree of notice as to what conduct on their part could lead to the termination" of their parental rights. Here, however, McBride does not complain that OFC failed to provide her with a case plan. Rather, she asserts that OFC failed to meet the statutory sixty-day requirement for completion of a case plan and complains of that plan's contents.[6] But

4. In response to Appellees' assertion of waiver, McBride directs us to Trial Rule 52 and contends that because the court was required by various sections of the CHINS statutes to issue findings, she was not required to challenge those findings prior to appeal. *See* T.R. 52(B) (providing party's failure to move to modify or object to findings entered under T.R. 52 does not constitute waiver of issue on appeal). McBride's response, however, misses the mark. In arguing that her procedural due process rights were violated, she does not attack specific findings. Rather, she raises a basic constitutional attack, relying on this court's decision in *A.P.* To preserve her constitutional claim for appeal, McBride could and should have raised her due process argument during the termination proceedings.

5. The irregularities at issue in *A.P.*, 734 N.E.2d at 1117, were as follows: (1) OFC admittedly failed to provide the parents with some, and perhaps, all of the case plans; (2) the termination petition did not comply with Indiana Code Section 31–34–2–4; (3) the original CHINS petition was unsigned and unverified; (4) no permanency hearing was ever held as required by Indiana Code Section 31–34–21–7; (5) several of the court's CHINS orders contained no written findings and conclusions as required by Indiana Code Section 31–34–19–10; (6) the court entered a no-contact order against the father without following statutory requirements; and (7) father was deprived of his right to be present at CHINS hearings.

6. Indiana Code Section 31–34–15–2 provides that OFC, after negotiating with the child's parent, shall complete a case plan not later than sixty days after the date of the child's first placement or the date of a dispositional

McBride admitted at the termination hearing that OFC provided her with case plans and that she was aware of what was required of her before OFC and the court would return her children to her care and custody. Additionally, our review of the record reveals that OFC presented a draft case plan to McBride within the sixty-day period but she did not sign the case plan until four months later. Thus, any alleged deficiencies regarding OFC's case plan did not deprive McBride of due process.

Similarly, McBride alleges error regarding the trial court's dispositional findings and findings entered following the periodic review hearings. Again, she does not contend that the court wholly failed to enter either dispositional findings required under Indiana Code Section 31–34–19–10, or periodic review findings required under Indiana Code Section 31–34–21–5. Instead, she complains about the adequacy of the findings. *Cf. A.P.*, 734 N.E.2d at 1117 (where trial court failed to enter any written findings and conclusions during CHINS proceeding).

■ Regarding the court's dispositional order and findings, as Appellees point out, the court expressly incorporated OFC's Juvenile Predispositional Report and Six–

Month Periodic Review Report and adopted OFC's recommendations contained in that report. In addition to the two pages of recommendations, OFC's report contains fifteen pages of family history, background, and placement options for the children. Accordingly, the court's dispositional order as a whole meets the statutory requirements for such orders. *See* Ind.Code § 31–34–19–10 (requiring written findings and conclusions accompanying dispositional decree concerning, in part, (1) needs of child for care, treatment, rehabilitation, or placement; (2) need for participation by parent; (3) efforts made toward reunification; (4) services offered; and (5) reason for disposition).

The court's orders regarding the periodic review hearings also incorporate extensive reports and recommendations filed by OFC.[7] And the court's periodic review orders contain substantially all of the determinations required under Indiana Code Section 31–34–21–5(a).[8] McBride goes to great lengths to point out alleged inadequacies with the court's orders, relying extensively on the fifteen factors discussed under Indiana Code Section 31–34–21–5(b).[9] But a close review of that statute

---

decree, whichever comes first. Indiana Code Section 31–34–15–4 sets forth the form and contents of the case plan.

7. The court conducted the first periodic review hearing in conjunction with the dispositional hearing on December 3, 2001. And on September 9, 2002, the court held the second periodic review hearing in conjunction with the permanency hearing.

8. Following a periodic review hearing, the court shall determine: (1) whether the child's case plan, services, and placement meet the special needs and best interests of the child; (2) whether the county office of family and children has made reasonable efforts to provide family services; and (3) a projected date for the child's return home, the child's adop-

tion placement, the child's emancipation, or the appointment of a legal guardian for the child. I.C. § 31–34–21–5. OFC concedes that the court's December review order did not specifically address subsection (3). But McBride has not demonstrated how this error denied her due process in the CHINS proceeding.

9. That statute provides that following the review hearing, the court's determination must be based on findings written after consideration of the following: (1) whether the OFC, the child, or the parent has complied with the case plan; (2) written documentation containing descriptions of the services offered; (3) extent of OFC's efforts to offer services; (4) extent of parent's ability to fulfill parental obligations; (5) extent of visitation; (6) extent of parent's cooperation with the OFC; (7)

reveals that the court is not required to enter a specific finding regarding each of the fifteen factors listed. Rather, the statute unambiguously states that "[t]he determination of the court under subsection (a) must be based on findings written *after consideration of*" the listed factors. Ind. Code § 31–34–21–5(b) (emphasis added). Although McBride complains that no evidence was presented at the periodic review hearings regarding each of the fifteen factors, we do not have transcripts of those hearings. Further, such a complaint is untimely at this juncture.[10]

McBride's final alleged procedural due process error in the CHINS proceeding involves the permanency hearing required under Indiana Code Section 31–34–21–7. In *A.P.*, 734 N.E.2d at 1117, no permanency hearing was held as required by Indiana Code Section 31–34–21–7. As we explained in that case, "[t]he primary purpose of such a hearing may be to reduce uncertainty and anxiety surrounding a young child's life, from both the child's and parent's perspectives, by requiring production of a 'permanency plan' for the child." *Id.* at 1115. We further noted that, had the permanency hearing taken place in that case, the court may have discovered and taken steps to remedy OFC's failure

to provide the parents with copies of the child's case plans. *Id.*

■ Here, unlike in *A.P.*, McBride does not contend that the court failed to conduct a permanency hearing. Instead, she complains that the court held the permanency hearing in conjunction with a periodic review hearing, did not make adequate findings, and conducted the hearing fourteen months, rather than twelve months, after the children's removal. But, again, McBride's contention that these alleged deficiencies denied her due process lacks merit.

First, she provides no authority to support her contention that it was error for the court to conduct a review hearing and the permanency hearing simultaneously. Furthermore, the findings required under the permanency hearing statute are the same as those required under Indiana Code Section 31–34–21–5, the periodic review hearing statute, and we have already determined that the court's findings under that statute were adequate. Regarding the timeliness of the permanency hearing, we acknowledge that under Indiana Code Section 31–34–21–7(c), there is a rebuttable presumption that jurisdiction over a CHINS continues for not longer than

---

child's recovery from any injuries suffered before removal; (8) whether additional services are required; (9) extent of child's rehabilitation; (10) examination of child's out-of-home placement; (11) extent to which reasons for removal·have been alleviated; (12) whether child's current placement shall continue; (13) extent of parent's participation in case planning, case reviews, dispositional reviews, placement and visitation; (14) the OFC's efforts toward reunification; and (15) whether it is an appropriate time to prepare or implement permanency plan. I.C. § 31–34–21–5(b).

**10.** McBride points out that in the second periodic review order, dated September 9, 2002, there is a discrepancy between the court's order that the children remain "in the homes

of the parents" and its adoption of OFC's recommendations, which provided that the children remain in foster care. Despite the language of the court's order, the children remained in foster care, consistent with OFC's recommendations. McBride alleges that the order was "clearly inconsistent with the trial court's true intentions" and "is an example of the trial court's lack of careful attention to the case before it." While we acknowledge the inconsistency in the court's order, McBride has not demonstrated how this isolated discrepancy has resulted in a denial of her due process rights. *See A.H.*, 751 N.E.2d at 701 (stating parents could not show outcome of CHINS proceeding would have been different absent alleged procedural errors and, thus, no due process violation occurred).

twelve months after the date of the child's removal. And OFC has the burden to show that the court's jurisdiction should continue. *Id.* Here, McBride points out that not only was the permanency hearing held beyond the twelve-month period, but OFC also did not show why jurisdiction should continue. Within the relevant twelve-month period, however, OFC had filed its Twelve–Month Periodic Review and Permanency Report, and the court granted OFC's motion for permission to file its termination petition. OFC's report, combined with the fact that OFC sought to terminate McBride's parental rights, were sufficient to rebut the presumption that the court's jurisdiction should last no longer than twelve months following the children's removal. McBride's alleged errors regarding the permanency hearing did not deny her due process.

■ In sum, McBride waived any due process challenge to the adequacy of the CHINS proceeding because she did not object during that proceeding or raise her constitutional claim at the termination hearing. Waiver notwithstanding, she has not demonstrated that any alleged procedural errors during the CHINS proceeding rise to the level of a due process violation. Therefore, McBride's reliance on *A.P.* is misplaced.

### Issue Two: Evidence to Support Termination

McBride also asserts that OFC failed to present sufficient evidence to support the trial court's termination order. She first contends that the trial court applied an incorrect evidentiary standard. She further claims that OFC failed to prove by clear and convincing evidence: (1) that there exists a reasonable probability that the conditions resulting in the children's removal will not be remedied or that the continuation of the parent-child relation-

ship poses a threat to the children's well being, and (2) that termination is in the children's best interests. We address her arguments in turn.

■ To support a petition to terminate parental rights, the OFC must show, among other things, that there is a reasonable probability:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child[.]

Ind.Code § 31–35–2–4(b)(2)(B). The OFC must also show that termination is in the best interests of the child. Ind.Code § 31–35–2–4(b)(2)(C). The OFC's burden of proof in this respect is met by clear and convincing evidence. *J.K.C. and S.R.C. v. Fountain County Dep't of Pub. Welfare,* 470 N.E.2d 88, 91 (Ind.Ct.App.1984). Where, as here, the trial court enters findings and conclusions on its own motion, the specific findings control only as to the issues they cover, and the general judgment standard controls as to the issues upon which the court has not made findings. *In re C.M.,* 675 N.E.2d 1134, 1138 (Ind.Ct.App.1997). The specific findings will not be set aside unless they are clearly erroneous, and we will affirm the general judgment on any legal theory supported by the evidence. *Id.* We neither reweigh the evidence nor judge the credibility of the witnesses, and we consider only the evidence that supports the judgment together with all reasonable inferences to be drawn therefrom. *In re M.B. and P.B.,* 666 N.E.2d 73, 76 (Ind.Ct.App.1996), *trans. denied.* A finding is clearly erroneous when there are no facts or inferences to be drawn therefrom which support it. *Id.* A judgment is clearly erroneous when it is unsupported by the findings and conclu-

sions entered on those findings. *In re Ellis*, 681 N.E.2d 1145, 1147 (Ind.Ct.App. 1997), *trans. denied.* On appeal, we will reverse a termination of parental rights only upon a showing of clear error which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind.Ct.App. 1997).

▮▮▮▮ In judging a parent's fitness, the trial court should examine the parent's fitness at the time of the termination hearing, as well as the parent's habitual patterns of conduct, to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re D.G.*, 702 N.E.2d 777, 779 (Ind.Ct.App. 1998). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, a trial court "can reasonably consider the services offered by the [OFC] to the parent and the parent's response to those services." *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind.Ct.App.1997); *see also In re D.B.*, 561 N.E.2d 844, 848 (Ind.Ct.App.1990) (looking at pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services), *questioned on other grounds by S.E.S. v. Grant County Dep't of Welfare*, 594 N.E.2d 447, 448 (Ind.1992). Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination. *A.A.C.*, 682 N.E.2d at 544. Indeed, a trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

### A. Standard of Proof

▮▮▮ McBride first asserts that the trial court's termination order warrants reversal because the court applied the wrong standard of proof. Specifically, she directs us to the court's findings and conclusions, which provide in relevant part:

5. It was established by clear and convincing evidence that the allegations of the petition to terminate rights are true in that:

\* \* \*

c. There is a *reasonable possibility* that the conditions that led to the removal or the reasons for the placement outside [McBride's] home will not be remedied.

(Emphasis added). McBride asserts that because the court's findings contain the phrase "reasonable possibility" as opposed to "reasonable probability" as required by statute, the court held OFC to a lower standard of proof. According to OFC, however, the trial court's substitution of the word "possibility" for "probability" is merely a scrivener's error. We must agree with OFC.

Although we do not have a copy of the petition to terminate McBride's parental rights, we do have the transcript from the initial hearing on that petition. During that hearing, the trial court reviewed the petition's contents with McBride, and it is clear from that hearing that the trial court was aware of the correct statutory standard. Specifically, the court advised McBride in relevant part:

[T]he children were adjudicated Children in Need of Services by order of this court. That the children have been removed from the care and custody of their parents for a period of more than six months under a dispositional decree of the court. *There is a reasonable probability that the conditions which re-*

sulted in the removal of the children or the reasons for placement outside the home of the parents will not be remedied, and/or, the continuation of the parent-child relationship poses a threat to the well being of the children .... You have the right to know ... why [OFC] has filed this petition, the burden is on [OFC] to prove by clear and convincing evidence ... the allegation[s] contained in this petition....

(Emphasis added). The court's statements during the initial hearing, combined with our review of the court's findings and conclusions as a whole, reveals that the court was aware of and applied the correct standard of proof. We agree with OFC that the word "possibility" in the court's findings is a typographical error, and we cannot conclude that the error warrants reversal of the termination decision. *See Willig v. Dowell*, 625 N.E.2d 476, 482 (Ind. Ct.App.1993) (stating typographical error in court's factual finding did not corrupt judgment), *vacated in part on other grounds on reh'g*, 627 N.E.2d 1365 (Ind.Ct. App.1994), *trans. denied.*[11]

### B. Conditions Which Resulted in Children's Removal Will Not be Remedied

Next, McBride attacks certain factual findings which support the trial court's conclusion that the conditions which resulted in the children's removal would not be remedied. Specifically, she contends that the following findings are not supported by the evidence:

> 5. It was established by clear and convincing evidence that the allegations of the petition to terminate parental rights are true in that:

---

**11.** On April 21, 2003, Appellees filed their Motion for Leave to Correct Clerical Mistake Pursuant to Trial Rule 60(A) with this court. Because we have determined that the court's

* * *

> x. *[OFC] has made numerous attempts along with the Rise personnel, the Department of Family and Children Services in Brunswick, Georgia[,] and Dagnia Feaster to assist Mary in providing the stability and safety for the children that they deserve. Mary has continued to maintain the abusive relationship with William that has been proven to be dangerous for her and for the minor children.* Mary has given false statements about her ongoing relationship with William. She maintained to the Rise personnel that she was afraid of William while she covertly received $1,000.00 in collect telephone calls from him while he was incarcerated in the Georgia prison. Mary drove to Indianapolis, Indiana and picked up William when he returned to Indiana following his release from the Georgia prison. Mary obtained a protective order in Monroe Circuit Court VI and continued to live off and on with William. *At the hearing in this case on October 21, 2002, Mary continued to state that she wanted to maintain the right to choose whether she wanted to have a relationship with William.*

* * *

> 7. Mary is either unwilling or unable to take responsibility for her actions. William is blamed for her arrest and conviction for Deposit Account Fraud in Brunswick, Georgia because "he made her write bad checks." Accord-

typographical error does not warrant reversal of the termination decision, we deny that motion as moot.

ing to Mary, she was controlled by Dagnia Feaster and forced to do or say things that Mary did not want to do. Yet the personnel at the Rise viewed Dagnia Feaster as a tireless advocate for Mary. According to Mary, [OFC] did not make arrangements for services. *There was little or no evidence of efforts made by Mary to obtain services for herself.*

8. Mary's attempts to remedy the situation that led to the removal of the children have been sketchy. The abusive relationship with William has continued throughout their marriage. Mary's evasive answers about the present state of that relationship means that it is more likely than not the relationship will continue. *She was ordered to obtain a psychological evaluation on July 1, 2001, but her first appointment was not until August 2002.* Again Mary puts the blame solidly on [OFC] without demonstrating what efforts she had made to schedule her own appointment or to request the court to order [OFC] to assist her.

(Emphases added).

■ Regarding evidence of services offered to McBride, McBride admitted at the termination hearing that in 1995, Georgia child protective services asked her to undergo a psychological evaluation and participate in a family building class in order to have her children returned to her. When McBride moved back to Indiana, at some point she moved into the Rise, where she was provided, at a minimum, a secure living environment for approximately 1½ years. Additionally, Fields, McBride's OFC caseworker, testified about the various services OFC provided McBride. Despite McBride's testimony that she did not

feel that OFC provided her services, she conceded that OFC wanted her to undergo a psychological evaluation, attend domestic violence support groups, refrain from contact with William, and develop a safety plan. This evidence supports the trial court's finding that OFC, the Rise, and Georgia child protective services have offered a variety of services to McBride over the years.

■ McBride also disputes the trial court's finding that she has continued to maintain a relationship with William. Specifically, she points out that the court's finding that her petition to dissolve her marriage is still pending is erroneous because she testified that her divorce was final in January 2000.[12] She further asserts that the court took out of context her testimony at the termination hearing that, at a prior hearing, she had informed the court that she wanted the right to choose whether to see William. She also directs us to her testimony that, prior to the termination hearing, she sought a protective order against William and wrote him a letter to inform him that she wanted no further contact.

We agree that the testimony at the termination shows that McBride's divorce was final in January 2000 and that, contrary to the court's finding, she did not state that she still wanted the choice of whether to see William. Nevertheless, there is an abundance of evidence in the record which supports the trial court's finding that McBride has continued to maintain contact with William. Finding 5.x., as a whole, shows that McBride lied to personnel at the Rise about her continued relationship with William. In addition, the Georgia court returned McBride's children to her based, in part, on her representation that

---

12. Finding 5.s. provides in relevant part that "Mary filed a Petition to Dissolve her mar-

riage to William in early 2000. The Petition is still pending."

she was having no contact with William. Yet after her children were returned to Indiana, McBride continued to have contact with William. And McBride admits to having contact with William as late as March 2002. We remind McBride that it is the trial court's duty to judge witness credibility. *See M.B.,* 666 N.E.2d at 76. From this evidence, the court may very well have determined that McBride's word cannot be trusted when it involves her relationship with William. Given her history of dishonesty in that regard, the evidence supports the court's finding regarding McBride's continued relationship with William.

Next, McBride argues that the court's findings provide incorrect dates regarding her psychological evaluations with Dr. Rautio–Dietz. Although we agree that her first meeting with Dr. Rautio–Dietz occurred in April 2002, not August 2002, McBride acknowledged at the hearing that OFC first asked her to obtain that evaluation in July 2001. Thus, while the court's finding contains an incorrect date regarding her first appointment with Dr. Rauito–Dietz, the evidence supports the finding that OFC asked her to obtain the evaluation in July 2001. In any event, the significance of the court's finding is that McBride waited ten months to comply with OFC's request that she undergo a psychological evaluation.

In addition, McBride's contention that the evidence does not support the court's finding that she made little or no efforts to obtain services for herself is not well taken. In addition to waiting ten months to see Dr. Rautio–Ditez, the evidence shows that McBride attended only four sessions of counseling at the Center for Behavioral Health. She also admitted that she stopped attending domestic violence counseling "[b]ecause going to those is not like a support group should be...." And although OFC repeatedly recommended that McBride have no contact with William to protect both her and the children's interests, McBride refused OFC's recommendation that she have no contact and maintained contact with him. Contrary to McBride's assertion, the trial court's findings are not clearly erroneous.

In addition to the trial court's extensive findings which support the conclusion that the conditions which led to the children's removal would not be remedied, we find significant that three of OFC's witnesses gave similar opinions that McBride had not demonstrated a willingness and/or ability to alter the conditions which led to the children's removal. Specifically, Fields stated that she did not "see that this pattern of abuse in mom going back to an abuser, whether it be William, or somebody else is going to change...." Dr. Rautio–Dietz testified that McBride has been placing her needs before the needs of her children. And, again, the children's CASA, Dr. Heumann, testified:

> [F]or the last seven and [one-]half years Mary has been making decisions which endanger her children. There've been four removals, there've been multiple mental health evaluations, extensive services, and this endangerment, I just don't see it changing.

We conclude that OFC proved by clear and convincing evidence that the conditions which led to the children's removal would not be remedied.[13]

---

**13.** Because the trial court's conclusion that there is a reasonable probability the conditions resulting in the children's removal will not be remedied is not clearly erroneous, we need not address McBride's alternative challenge to the trial court's finding that a continuation of the parent-child relationship poses a threat to the child's well-being. Indiana Code Section 31–35–2–4(b)(2)(B) requires the OFC

### C. Termination in Children's Best Interests

McBride's final contention is that the court erred when it determined that termination of her parental rights is in Z.M., S.M. and M.M.'s best interests. She argues, in the main, that the court should have denied OFC's petition and allowed her time to undergo treatment for her various disorders. She directs us to Dr. Rautio–Dietz's testimony that, with consistent therapy, she could show progress within six months. She also complains that OFC has not afforded her an opportunity to demonstrate her parenting skills.

We are mindful that in determining what is in the best interests of the children, the court is required to look beyond the factors identified by the office of family and children, and look to the totality of the evidence. *In re A.K.*, 755 N.E.2d 1090, 1097 (Ind.Ct.App.2001). In so doing, the trial court must subordinate the interests of the parents to those of the children. *Id.* The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *C.M.*, 675 N.E.2d at 1139. In addition, this court has previously determined that the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. *In re Campbell*, 534 N.E.2d 273, 276 (Ind.Ct.App.1989); *see also In re K.H.*, 688 N.E.2d 1303, 1306 (Ind.Ct.App.1997).

Here, both Fields and Dr. Heumann testified that termination of McBride's parental rights would serve the children's best interests. Moreover, both discussed the children's need for permanency. The testimony of Fields and Dr. Heumann alone is sufficient to support the court's conclusion that termination is in the children's best interests. *See In re T.F.*, 743 N.E.2d 766, 776 (Ind.Ct.App. 2001) (holding testimony of guardian ad litem and caseworker that reunification was not in child's best interests was sufficient to support court's conclusion that termination was in child's best interests), *trans. denied.* Moreover, several witnesses, including Carole Gore, Fields, and Dr. Heumann, testified that the children were thriving in their current foster home. Accordingly, we conclude that OFC proved by clear and convincing evidence that termination of McBride's parental rights would be in the children's best interests.

### CONCLUSION

McBride waived her constitutional due process challenge because she failed to raise it in the trial court. Notwithstanding waiver, the alleged procedural deficiencies in McBride's CHINS proceeding do not rise to the level of a constitutional violation. Additionally, we conclude that OFC presented sufficient evidence to support the trial court's termination order.

Affirmed.

BROOK, C.J., and BAILEY, J., concur.

### ORDER

This Court having heretofore handed down its opinion in this appeal on July 7, 2003, which affirmed the decision of the trial court, which opinion was marked Memorandum Decision, Not for Publication.

Comes now the Appellee Monroe County Office of Family and Children, by counsel, and files herein Motion to Publish, alleging therein that the opinion clarifies and modifies case law by holding that by failing to make a timely objection at trial or during the CHINS proceeding, the respondent

only to prove *either* circumstance by clear and convincing evidence.

waived her constitutional claim that her due process rights were violated by alleged procedural irregularities in the CHINS proceedings.

The Court having examined said Motion to Publish, having reviewed its opinion in this case and being duly advised, now finds that the Appellee's said Motion to Publish should be granted.

IT IS THEREFORE ORDERED that the Appellee's Motion to Publish is GRANTED and this Court's opinion heretofore handed down on July 7, 2003, marked Memorandum Decision, Not for Publication in now ordered published.