895 N.E.2d 1228 (2008)
In re The TERMINATION OF the PARENT-CHILD RELATIONSHIP OF J.M., the Child,
Daniel G. Pappas, Guardian ad Litem, Appellant,
v.
A.S., the Child's Mother, A.M., the Child's Alleged Father, and unknown father, and the Allen County Department of Child Services, Appellees.
No. 02A05-0807-JV-416.
Court of Appeals of Indiana.
November 5, 2008.
*1230 Daniel G. Pappas Fort Wayne, IN, Attorney for Appellant.
Richard L. Williams, Fort Wayne, IN, Attorney for Appellee, A.M., Father.
Thomas C. Allen, Fort Wayne, IN, Attorney for Appellee, A.S., Mother.

OPINION
DARDEN, Judge.

STATEMENT OF THE CASE
Daniel G. Pappas, the guardian ad litem (the "GAL"), appeals the trial court's denial of the Allen County Office of Family and Children's (the "Allen County OFC") petition to terminate the parental rights of A.S. ("Mother") and A.M. ("Father") as to their minor child, J.M.
We reverse and remand.
ISSUE
Whether the trial court erred in denying the petition to terminate the parental rights of Mother and Father.

FACTS
J.M. was born on November 1, 1999. In April of 2002, Mother was arrested for attempted dealing in methamphetamine, resulting in removal of J.M. from her care for thirty days. Mother was found guilty and sentenced to a suspended sentence of ten years.
In 2004, the State again charged Mother with attempted dealing in methamphetamine and conspiracy to deal in methamphetamine. Mother received a total executed sentence of sixteen years for the 2002 and the 2004 offenses. Accordingly, Mother has been incarcerated in the Rockville Correction Facility since August of 2004. Mother's earliest release date is April of 2011.
Father has been incarcerated in the Plainfield Correctional Facility since October 18, 2004, following his conviction for class D felony conspiracy to deal in methamphetamine and for violating the terms of his community correction placement, which he received after a 2002 conviction for attempted dealing in methamphetamine. His current release date is January 5, 2010.
The Montgomery County OFC removed J.M. from Mother's care in April of 2004, following Mother's second arrest. J.M. then went to live with his maternal grandmother and aunt in Vermillion County. J.M.'s aunt was appointed as his guardian in November of 2004. J.M. lived with his aunt and grandmother until they "no longer wanted to care for [him]...." (Tr. 82). The Vermillion County OFC dissolved the guardianship in December of 2004; thereafter, it placed J.M. in licensed foster care. J.M.'s paternal uncle and aunt subsequently sought guardianship of J.M.; in November of 2005, the Vermillion County OFC granted guardianship to the uncle and aunt despite the Allen County OFC's recommendation that they not be awarded guardianship due to past issues of abuse. Following allegations of abuse of J.M., the Allen County OFC removed J.M. from his uncle and aunt's home in February of 2006 and placed him in foster care, where he remains.
On or about March 28, 2006, the Allen County OFC filed a petition, alleging J.M. to be a child in need of services ("CHINS") pursuant to Indiana Code section *1231 XX-XX-X-X.[1] It alleged that neither Mother nor Father could provide J.M. with a safe and stable environment in which to reside due to their incarceration. Both Mother and Father admitted the allegations of the CHINS petition.
On May 31, 2006, the trial court determined J.M. to be a CHINS and entered a parental participation decree. Among other things, the trial court ordered both Mother and Father to "[m]aintain clean, safe, and appropriate housing at all times[.]" (State's Ex. 9). The trial court further ordered Mother to "[e]nroll in and complete any available drug and/or alcohol program at [her] correctional facility"; "[b]egin participation in weekly Narcotics Anonymous and or Alcohol Anonymous meetings, obtain a sponsor, and show proof of weekly attendance to the case manager at the end of every month"; "[e]nroll in parenting classes as directed, attend all sessions, and successfully complete the program"; and "[e]nroll in and complete college and vocational courses while incarcerated." Id.
As to Father, the trial court also ordered that he "[e]nroll in and complete any available drug and/or alcohol program at [his] correctional facility"; "[b]egin participation in weekly Narcotics Anonymous and or Alcohol Anonymous meetings, obtain a sponsor, and show proof of weekly attendance to the case manager at the end of every month"; "[e]nroll in anger management/non-violence counseling and successfully complete the program"; "[e]nroll in parenting classes as directed, attend all sessions, and successfully complete the program"; "[e]nroll in and complete college and vocational courses while incarcerated"; and "[e]nroll in and complete the long distance dad program at [his] correctional facility." Id.
On July 25, 2007, the Allen County OFC filed a petition to terminate the parental rights of Mother and Father. The trial court held a termination hearing on January 8, 2008.
Mother testified that her earliest scheduled release date is April of 2011; however, if she completes her undergraduate degree, her release date could be as early as April of 2009. According to Mother, she has had only three visits with J.M. since her incarcerationtwo in early 2005 and one on December 25, 2005but she wrote him every week. She further testified that she has not been able to provide financial support for J.M.; and has not secured housing or employment upon her release.
Father testified that he had enrolled in a drug program and participated in Narcotics Anonymous meetings but had not "submitted anything proving this...." (Tr. 45). He further testified that he had enrolled in anger management classes and college or vocational courses. However, he had not enrolled in parenting classes because they were "[n]ot available." Id. He further testified that he had seen J.M. twice in 2005. He testified that he had not provided monetary support for J.M. since his incarceration. According to Father, he had "a job *1232 waiting on [him]" and would "not have a problem having a place to live...." (Tr. 50, 51). Father admitted that his current scheduled release date is in January of 2010 but testified that he could be released "at the latest January, 2009" if he were to successfully complete a substance abuse program. (Tr. 52). Father, however, alternatively testified that he would be eligible for release in July of 2008. At the time of the hearing, however, he had not completed that program.
Faith Jackson, the case manager for J.M., testified that Father had not communicated with J.M. since 2005. She testified that Mother writes to J.M., and he writes back to her "[e]very once in a while." (Tr. 90). According to Jackson, J.M. had written to Mother "four times in the year 2007." Id. Jackson further testified that the Allen County OFC's plan for J.M. is adoption and that there is a family interested in adopting him.
The GAL testified that he was appointed as J.M.'s GAL in May of 2006. He opined that he believed termination of parental rights to be in eight-year-old J.M.'s best interests as he had been out of his parents' care intermittently since the age of one and a half years and completely since the age of three and a half years, with minimal contact with the parents since 2005. Further, given Mother's earliest release date of April 2011 and Father's current release date of January of 2010, J.M. would have to spend at least another two years in foster care awaiting his Father's release.
On February 29, 2008, the trial court entered its order, denying the petition to terminate Mother and Father's parental rights. The trial court found, in pertinent part, as follows:
2. The child, [J.M.], was born to [Mother and Father] on November 1, 1999.
3. A Preliminary Inquiry was held in the above referenced [CHINS] case on February 28, 2006. Probable Cause was found to believe that [J.M.] was a [CHINS]. The Court authorized the [Allen County OFC] to file a petition.
4. An Initial Hearing was scheduled for May 3, 2006 at which the Mother and [Father] appeared telephonically. The child's guardians ... also appeared. [Mother and Father] admitted that they were incarcerated in 2004 following their convictions for attempted dealing in methamphetamine and for conspiracy to deal in methamphetamine. [J.M.] was adjudicated a [CHINS] and a dispositional hearing was held. The parents were placed under a parent participation plan wherein they were ordered to cooperate with the [Allen County OFC] casemanagers [sic], enroll and attend Narcotics Anonymous (NA) meetings, complete a drug and alcohol assessment and follow all recommendations, enroll and satisfactorily complete parenting classes, and complete a college or vocational education program while incarcerated.
* * *
7. [M]other is presently incarcerated in Rockville Correctional Facility. Her official release date is in 2011. However, if she should complete her college degree then she will be eligible for work release in May, 2008. Substance abuse counseling is not available to her. [M]other has enrolled and is completing college courses. She writes [J.M.] every week. [Father] has been incarcerated in Plainfield Correctional Facility since October 18, 2004. His earliest release date i[s] July, 2008. While in prison he has completed drug and alcohol assessment, enrolled in college, and attends Narcotics Anonymous meetings. Parenting classes are not available to him in prison.

*1233 8. Both parents have completed all of the services required of them under the dispositional decree that are available to them in prison.
9. Neither parent has seen [J.M.] since 2005.
10. [Father] has three other children for whom he is obligated to pay support. He is not current on his obligations to any of his children.
11. The [OFC] has an appropriate plan for [J.M.] should parental rights be terminated; that being adoption.
12. The [GAL] believes that [J.M.]'s best interests are served by termination [of] the parent-child relationship. In support of his conclusion, he cited that fact that [J.M.] is eight years of age and has no relationship with his parents. He has been placed with relatives and licensed foster care for most of his life.
(App.38-39). The trial court then concluded, in pertinent part, as follows:
2. [T]he court must find that there is a reasonable probability that the conditions that resulted in [J.M.]'s removal or the reasons for placement outside the home of the parents will not be remedied; or that continuation of the parent-child relationship poses a threat to the well being of [J.M.].... The court cannot conclude from the evidence that the parents cannot provide for [J.M.] once they are released from prison. Their imprisonment is the only basis for the adjudication of CHINS. The parents have fully cooperated with the services required of them while incarcerated. Their probable dates of release are close in time and the [J.M.]'s permanency will not be unreasonably delayed if the petition to terminate parental rights is denied. The parents should be given an opportunity to demonstrate that they have benefited form [sic] the services provided to them while in prison and that [J.M.] can be safely reunited into their care. A comparison of two cases is instructive. In the case of Rowlett v. Vanderburgh County Office of Family and Children, 841 N.E.2d 615 (Ind.Ct. App.2006) the father was convicted and imprisoned within months of the CHINS adjudication of his children. The children were ages three and two years when he was jailed. Throughout the underlying CHINS case, the father remained incarcerated. However, he completed several services and college classes during that time. In reversing the termination order, the court stated that the trial court's result was "particularly harsh where Father, while incarcerated, participated in numerous services and programs, although offered by the correctional facility and not the OFC, which would be helpful to him in reaching his goal of reunification with his children." [841 N.E.2d at 619.] In contrast, the court in Castro v. State of Indiana Office of Family and Children, 842 N.E.2d 367 (Ind.Ct.App.2006)[, trans. denied,] found that the termination of the parental rights of an incarcerated parent was not error. In Castro, the father had little or no contact with the child prior to his incarceration. Unlike in Rowlett, the father's release date was not to occur within weeks but years. At the time of the termination hearing (2005) the child was ten years old. By the time of the father's release (2012) the child would be near adulthood. The court noted that the father was "helpless to remedy those conditions in a meaningful timeframe." [842 N.E.2d at 374.] In addition, the father had a lengthy felony conviction record making his re-entry into society difficult.

*1234 In the present case, the parents' release dates are to occur soon. They have completed many of the required services under the dispositional decree while incarcerated. They had a relationship with [J.M.] prior [to] their imprisonment and attempted to keep [J.M.] in the care of relatives prior to their convictions. Their ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time. Thus, [J.M.]'s need of permanency is not severely prejudiced.
(App.39-40). The trial court therefore denied the OFC's petition to terminate the parental rights and ordered that J.M. "continue[] in licensed foster care as a ward of the [Allen County OFC]...." (App.40).

DECISION
The GAL asserts the trial court erred in denying the petition to terminate the parents' rights. Essentially, the GAL argues that the Allen County OFC proved by clear and convincing evidence that the reasons for J.M.'s removal from his parents' care will not be remedied and that termination of Mother's and Father's parental rights is in J.M.'s best interests. We agree.
Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. In re A.N.J., 690 N.E.2d 716, 720 (Ind.Ct.App.1997). The purpose of termination of parental rights is not to punish parents but to protect children. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App. 1999), trans. denied, cert. denied, 534 U.S. 1161, 122 S.Ct. 1197, 152 L.Ed.2d 136 (2002).
In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. Bester v. Lake County Office of Family and Children, 839 N.E.2d 143, 147 (Ind.2005). We consider only the evidence most favorable to the judgment. Id. Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. Id. We must determine whether the evidence supports the findings and then whether the findings support the judgment. Id. We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. Id. A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. Id.
When a county office of family and children seeks to terminate parental rights, the office must plead and prove in relevant part that:
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
Ind.Code § 31-35-2-4(b)(2). These allegations must be established by clear and convincing evidence. A.N.J., 690 N.E.2d at 720.
In determining whether the conditions will not be remedied, the trial court *1235 "first should determine what conditions led the State to place the child outside the home and with foster care, and second whether there is a reasonable probability that those conditions will be remedied." Id. The juvenile court should judge a parent's fitness to care for the child as of the time of the termination hearing and take into account any evidence of changed conditions. In re D.J., 755 N.E.2d 679, 684 (Ind.Ct.App.2001), trans. denied. "The trial court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. "A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." McBride v. Monroe County Office of Family and Children, 798 N.E.2d 185, 199 (Ind.Ct.App.2003).
In determining the best interests of the child, we "look beyond the factors identified by the office of family and children, and look to the totality of the evidence." Id. at 203. In so doing, the trial court must subordinate the interests of the parents to those of the child. Id. "The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." Id. A child's need for permanencyand a GAL's testimony regarding suchis an important consideration in determining a child's best interests. Id.
Here, the trial court relied on Rowlett v. Vanderburgh County Office of Family and Children, 841 N.E.2d 615 (Ind.Ct.App. 2006), trans. denied, in determining that "[J.M.]'s permanency will not be unreasonably delayed if the petition to terminate parental rights is denied." (App.40). In Rowlett, the Vanderburgh County OFC took Rowlett's children into protective custody in June of 2002; placed them with their maternal grandmother and step-grandfather; and filed a petition, alleging the children to be CHINS. Two months later, on August 26, 2002, Rowlett was arrested and charged with two drug offenses. The trial court sentenced Rowlett to a total executed sentence of six years. The Vanderburgh County OFC filed a petition to terminate Rowlett's parental rights on October 22, 2003. On April 12, 2005, six weeks prior to Rowlett's scheduled release from incarceration and over his timely objection, the trial court held a hearing on the petition. On April 21, 2005, it entered its orders terminating Rowlett's parental rights. Rowlett appealed.
This Court determined that the Vanderburgh County OFC had not established that termination would be in the children's best interests given that termination of Rowlett's parental rights would not result in a more stable and secure environment. The Court recognized that the children had been in the care and custody of their grandparents since their removal from their parents and would remain in the care and custody of their grandparents regardless of whether Rowlett's rights were terminated. Finding that "[t]his is not a case where the children are in a temporary arrangement pending termination of parental rights," this Court could "see little harm in extending the CHINS wardship until such time as [Rowlett] ha[d] a chance to prove himself a fit parent for the children" as "continuation of the CHINS wardship w[ould] have little, if any, impact, upon them." Id. at 623.
Furthermore, Rowlett was scheduled to be released from incarceration in as few as six weeks from the termination hearing, whereupon he could "establish himself in *1236 the community and ... participate in services offered by the [Vanderburgh County] OFC to make him a better person and parent for C.R. and A.R." Id. Despite not being offered services while incarcerated, Rowlett already had taken "steps and made a good-faith effort to better himself as a person and as a parent" by participating in nearly 1,100 hours of individual and group services. Id. at 622. He also had secured employment for after his release and planned to live with his aunt. Finally, he had "maintained a relationship with his children while incarcerated," corresponding with them through the mail communicating with them through telephone calls. Id. at 622.
We find Rowlett distinguishable from the case at hand. Here, Mother's earliest release date is not until April of 2011. Granted, Mother could possibly be released as early as April of 2009; that release date, however, is contingent on Mother completing her college courses. Father's current release date is January of 2010. Mother has neither employment nor housing secured for after her release. Although Father testified that he has employment and housing secured, he could offer no proof of the specifics regarding his housing.
J.M has been removed from Mother's care since 2004, having been placed in the homes of various relatives and foster homes; since January of 2006, he has been wholly in foster care. Given that the earliest guaranteed release date for either parent is January of 2010, J.M. would have to remain in foster care for two more years from the date of the hearing, pending Father's release. Additionally, given that neither Mother nor Father has secured employment or housing, it is foreseeable that J.M. would have to remain in foster care until his parents could take on the responsibilities of parenthood; however, there is no guarantee that either parent will be able to care for J.M. following their release. Given the evidence in the record, we find that the Allen County OFC presented clear and convincing evidence that the parents are unable to provide a safe and stable environment for J.M. and therefore are unable to remedy the conditions that led to J.M.'s removal from their care.
Furthermore, we find that the Allen County OFC presented clear and convincing evidence that it is in J.M.'s best interests to terminate the parental rights of Mother and Father. J.M. has been in temporary care of various relatives and in foster homes since 2002. A continuation of the CHINS wardship would result in J.M. remaining in foster care for at least two more years with no guarantee that, upon their release, either Mother or Father will be a suitable parent. See In re S.P.H., 806 N.E.2d 874, 883 (Ind.Ct.App.2004) (finding termination of the father's parental rights to be in child's best interests where, even assuming the father would be released from incarceration in two or three years, there would be no guarantee that he would be able to care for his children or get custody of them). Although Mother corresponds with J.M., she has not seen him since 2005; Father has not seen or communicated with him since 2005. Given the totality of the evidence, we cannot say that J.M.'s best interests are met by denying the petition to terminate the parental rights of Mother and Father.
Given the evidence presented, including the GAL's testimony that termination would be in J.M.'s best interests, we conclude that the trial court's denial of the petition for termination of both Mother's and Father's parental rights is clearly erroneous. *1237 Accordingly, we reverse the trial court's determination that Mother's and Father's parental rights as to J.M. should not be terminated, and we remand to the trial court with instructions to enter an order terminating the parental rights of Mother and Father.
Reversed and remanded.
FRIEDLANDER, J., and BARNES, J., concur.
NOTES
[1] Indiana Code section 31-34-1-1 provides as follows:

A child is a child in need of services if before the child becomes eighteen (18) years of age:
(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
(2) the child needs care, treatment, or rehabilitation that:
(A) the child is not receiving; and
(B) is unlikely to be provided or accepted without the coercive intervention of the court.