**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 22 2013, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**NATALIE FANTETTI**
DCS, Miami County Local Office
Peru, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: )
)
)
D.F. & H.D. (Minor Children), )
)
and, )
)
J.D., (Mother), )
)
  Appellant-Respondent, )
)
    vs. )  No. 52A05-1210-JT-531
)
THE INDIANA DEPARMENT OF )
CHILD SERVICES, )
)
  Appellee-Petitioner. )

APPEAL FROM THE MIAMI SUPERIOR COURT
The Honorable Daniel C. Banina, Judge
Cause No. 52D02-1110-JT-24 & 52D02-1110-JT-25

**May 22, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

J.D. ("Mother") appeals the termination of her parental rights to her children, D.F. and H.D.[1]  We affirm.

## Issue

The sole restated issue is whether there is sufficient evidence to support the termination of Mother's parental rights.

## Facts

D.F. was born in 1997, and H.D. was born in 2001.  Mother has a third child, D.C., who is now over eighteen years old.  When D.C. turned thirteen years old, Mother smoked marijuana with him and gave him a "party tattoo" that was supposed to signify that he was old enough to begin smoking marijuana.  Tr. p. 158.  Mother also smoked marijuana with D.F. on her thirteenth birthday and gave her a "party tattoo" as well.  Id. at 124.  Mother frequently had guests at her house and would smoke marijuana with them in her bedroom while the children were home.  D.F. felt uncomfortable with many of these guests.  Additionally, Mother has been prescribed a number of medications for

---

[1] D.F.'s and H.D.'s fathers have not appealed the termination of their parental rights to their children.

ailments including fibromyalgia, anxiety, and depression. At times, Mother permitted D.C. to sell her prescription Klonopin pills when she needed money.

On July 27, 2010, the Department of Child Services ("DCS") removed the children from Mother's home after a visit revealed that the home was extremely dirty; the removal was also based upon the marijuana usage and educational neglect, with D.F. and H.D. missing many days of school and having poor grades and H.D. repeatedly going to school with head lice. In April 2009, DCS had previously substantiated that the children were being subjected to educational neglect as well as living in a health-endangering environment.

After removal, D.F. and H.D. were placed with a foster family. D.C. is now living independently. Mother later admitted that the children were CHINS. The dispositional order required Mother, in part, to participate in home-based services; to follow all recommendations from a substance abuse screening; to participate in random drug and alcohol screens; to participate in Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA") meetings; to participate in individual and family counseling as deemed appropriate; and to not expose her children to people with a history of drug or other illegal activity.

As a result of what the DCS discovered at Mother's home, she was charged with three counts of Class D felony neglect of a dependent. When she was arrested on these charges, the State obtained a no contact order prohibiting Mother from contacting her children and from going to her home. However, on September 30, 2010, the State agreed

3

to modify the no contact order to permit contact with the children under the auspices of the DCS and to allow her to go back to her home. On December 9, 2010, Mother pled guilty to one count of Class D felony neglect of a dependent, to be sentenced as a Class A misdemeanor. Mother was sentenced to time served and probation.

Mother began undergoing individual counseling in the fall of 2010, as recommended after a psychological evaluation, but she had quit going by the end of the year. Mother underwent another evaluation in October 2011, at DCS's behest, which again recommended she undergo individual counseling. Mother did not do so. One psychologist believed that Mother had borderline personality disorder, which is defined as having mood instability and having volatile interpersonal relationships. Another believed Mother had histrionic personality disorder, which is described as having a need to be the center of attention and a tendency to "make a mountain out of a molehill." Id. at 221. Because Mother never completed individual counseling, she and the children never underwent family counseling.

Mother also failed to follow through on recommendations made by a substance abuse evaluation, although she claimed to have completed an intensive outpatient treatment ("IOT") program. DCS did not refer Mother to this program and so it did not receive information regarding Mother's progress in it. Mother also completed four steps of a twelve-step AA/NA program.

Between July 2010 and January 2012, Mother underwent approximately forty drug screens through DCS. Mother was not always compliant with undergoing random

4

screens, however.  Her only positive test, for marijuana usage, occurred on September 30, 2011, after she had completed the IOT program.  This test, which detects marijuana in the body within seventy-two hours of use, was taken one day after Mother had in-home visitation with the children for the first time since their removal.  There were no more in-home visitations after this test result.  Although Mother was still on probation at the time of this test, her probation was not revoked after she passed a test given by the probation department two weeks after the failed DCS test.  Mother was soon thereafter successfully discharged from probation.

Shortly after the children were removed from Mother's home, she began dating a man who eventually moved in with her.  This frustrated D.F., who believed Mother had a tendency to put her relationships with various men ahead of her children.  The boyfriend refused to take a drug test through DCS, which would have been a requirement if Mother was ever going to regain custody of the children while he lived with Mother.  The boyfriend also has a prior felony conviction, meaning that DCS ruled him out as an appropriate person to live with Mother and the children.

Mother also eventually worked on cleaning and repairing her home so that it would be suitable for the children, although it "took a very long time to get her motivated" to do so.  Id. at 269.  A home-based counselor opined that the home was rendered habitable by the early summer of 2011, although the counselor also noted that Mother had not replaced a couch in the home in which mice had previously nested.  This

counselor also believed that when Mother's case was closed in December 2011, she had learned some parenting skills but not enough to be an effective parent.

After D.F. and H.D. were removed from Mother's care, their attendance at school vastly improved and H.D. has had no reoccurrence of head lice. D.F. now receives very good grades in school, and while H.D.'s grades are not as good as D.F.'s, they have improved and previous behavioral issues H.D. had been experiencing in school were reduced. D.F. has said that she does not want to live with Mother again. The foster parents also have expressed a desire to adopt D.F. and H.D.

On October 27, 2011, the DCS filed a petition to terminate Mother's parental rights. The trial court held a hearing on the petition on June 4, 2012. On September 24, 2012, the trial court entered its order with findings terminating Mother's parental rights. Mother now appeals.

**Analysis**

"When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id.

6

We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. Id.

A petition to terminate a parent-child relationship must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

7

> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS has the burden of proving these allegations by clear and convincing evidence. I.A., 934 N.E.2d at 1133.

Mother contends there is insufficient evidence to support the trial court's finding of a reasonable probability that the conditions leading to the removal of D.F. and H.D. from her care would not be remedied. When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. In re A.I., 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), trans. denied. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. McBride v. Monroe County Office of Family and Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). A court may likewise consider services offered by the DCS to the parent and the parent's response to those services. Id. "Finally, we must be ever mindful that parental rights, while constitutionally protected,

8

are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." Id.

Here, D.F. and H.D. were removed from Mother's care in July 2010 because of the poor condition of the home and hygiene issues of H.D., i.e. head lice, educational neglect, and Mother's extensive drug use while the children were home, including introducing D.F. and D.C. to marijuana usage. The DCS had also substantiated similar conditions in Mother's home in April 2009. Regarding the condition of the home, the trial court did find that Mother had rectified that condition by the time of the termination hearing—several months before that, in fact—and there is evidence to support that finding. However, the home-based counselor who assisted and observed the clean-up process believed Mother was slow to begin that process.

Regarding Mother's drug usage, she chose to complete a drug treatment program that fell outside DCS's auspices. As a result, it had no knowledge of how successful she was in that program. Mother makes much of the fact that of as many as forty drug tests that she underwent from the beginning of the CHINS case to January 2012, she only tested positive for an illegal substance, marijuana, on one occasion. That one occasion, however—September 30, 2011—was one day after her very first in-home visitation with the children since they had been removed from her care. That is very troubling, given the history of drug usage between Mother and her children. Mother insists that she did not smoke marijuana and does not know how it showed up in her test, but the lab technician discounted the possibility of a false positive. Moreover, Mother does not dispute the trial

9

court's finding that, based on Mother's sometimes-spotty compliance with random drug testing and the fact that marijuana could be discovered only within seventy-two hours of use, she could have been continuing to smoke marijuana on occasion without detection. Finally, the positive marijuana test took place approximately one month after she had completed the unauthorized IOT drug program, indicating the program may not have worked.

Mother also twice failed to follow through with individual therapy for herself. This therapy was recommended by at least two psychologists to address personality issues that, as described, clearly would have negatively impacted her parenting and her relationships with her children. Instead of completing a course of therapy, Mother would quit going when she disagreed with or decided she did not like the therapist. Mother's failure to complete individual therapy also prevented the commencement of therapy for the whole family, which was required by the CHINS dispositional order.

Finally, we note Mother's beginning of a relationship with a man, who later moved in with her, shortly after D.F. and H.D. were removed from her custody. This boyfriend has been ruled out by DCS as an appropriate co-inhabitant with Mother and her children. Thus, any reunification between Mother and her children would be precluded by her current relationship. D.F. in particular stated that Mother's entering into this relationship shortly after the children's removal was consistent with Mother's self-centered past practice of placing relationships with men above relationships with her children.

10

In sum, we cannot deny that Mother made some progress during the pendency of the CHINS action, most notably in the eventual cleaning up and repairing of her home. However, the overall pattern of Mother's conduct was that her efforts to comply with DCS services often were half-hearted or incomplete. Without fully complying with the DCS services, there remains a substantial risk of D.F. and H.D. again being neglected if they were to be returned to Mother. Additionally, there was evidence that one of the most troublesome aspects of Mother's parenting—her drug use in the home—was not adequately addressed by her. It also is worth noting that the conditions leading to the children's removal had been documented more than a year before that time, indicating that Mother has had unresolved difficulties with parenting for a substantial period predating the CHINS action. As such, we cannot say the trial court clearly erred in finding sufficient evidence of a reasonable probability that the conditions that caused the removal of D.F. and H.D. from her care would not be remedied.

Mother also claims there is insufficient evidence that termination of her parental rights was in D.F. and H.D.'s best interests. In determining whether termination is in the best interests of a child, a court may look beyond the factors identified by the DCS and look to the totality of the evidence. In re I.A., 903 N.E.2d 146, 155 (Ind. Ct. App. 2009). In making a best interests determination, courts must subordinate the interests of the parent to those of the child. Id. Courts need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Termination of parental rights is in a child's best interests if his or her emotional and/or physical development is threatened.

11

Stewart v. Randolph County Office of Family & Children, 804 N.E.2d 1207, 1212 (Ind. Ct. App. 2004), trans. denied.

Here, before the children's removal from Mother's care, they were missing much time at school and receiving poor grades. H.D. was suffering from uncured head lice. After placement in their current foster home, both D.F. and H.D.'s grades and attendance improved, with D.F.'s grade improvement being particularly dramatic. H.D.'s head lice was cured shortly after moving in with the foster parents and has not returned. D.F. expressed her personal wish that she not return to live with Mother. This evidence establishes that both D.F. and H.D.'s emotional/mental and physical development was threatened while in Mother's care, while that threat has been alleviated during their stay with the foster family who wishes to adopt them. There is sufficient evidence that termination of Mother's parental rights is in the children's best interests.[2]

**Conclusion**

The trial court's decision to terminate Mother's parental rights is supported by the evidence and not clearly erroneous. We affirm.

Affirmed.

NAJAM, J., and BAILEY, J., concur.

---

[2] Mother makes no challenge to the adequacy of the DCS's plan following termination.

12