**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 15 2014, 10:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE INVOLUNTARY         )
TERMINATION OF THE PARENT-CHILD          )
RELATIONSHIP OF W.H., MINOR CHILD,       )
AND HIS MOTHER, J.F.,                     )
                                          )
J.F.,                                     )
                                          )
    Appellant-Respondent,               )
                                          )
      vs.                              )   No. 79A02-1312-JT-1034
                                          )
INDIANA DEPARTMENT OF CHILD              )
SERVICES,                                 )
                                          )
    Appellee-Petitioner.                )

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Faith A. Graham, Judge
Cause No. 79D03-1305-JT-34

**July 15, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

Appellant-Respondent J.F. ("Mother") appeals the juvenile court's order terminating her parental rights to W.H. ("Child"). When the Indiana Department of Child Services ("DCS") became aware that Mother and Child were homeless and currently living with a convicted sex offender, it filed a petition alleging Child to be a child in need of services ("CHINS"). Child was found to be a CHINS, removed from Mother's care, and Mother was ordered to complete various services. Eventually, DCS filed a petition to terminate Mother's and W.H.'s ("Father") parental rights in Child ("TPR petition"). At a hearing on the TPR petition, DCS presented evidence related to Mother's mental health issues, substance abuse, instability, poor judgment in interpersonal relationships, and non-compliance with services.

Following the hearing, the trial court terminated Mother's and Father's parental rights in Child. Mother alleges that DCS did not provide sufficient evidence to support the juvenile court's findings that the conditions which resulted in Child's placement outside of her home were not likely to be remedied, continuation of the parent-child relationship posed a threat to Child's well-being, and termination of the parent-child relationship was in Child's best interest. Concluding that the evidence was sufficient to support the termination of Mother's parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

Child was born on November 21, 2007 to Mother and Father. On August 5, 2011, DCS filed a CHINS petition. The petition alleged, *inter alia*, that DCS had learned that

2

Mother and Child were homeless and staying in a home with Mother's sister and her husband, a convicted sex offender. During the investigation that preceded the CHINS petition, a DCS caseworker interviewed Mother on August 1, 2011. Mother told the caseworker that she was twenty-one years old; had never had a job; was currently staying with her aunt and uncle, a convicted child molester; was able to make ends meet by accepting money from friends and through Medicaid and food stamps; had been diagnosed with depression but was not currently in therapy or on medication; she could not stay with her mother or father; and that her family does not want to have anything to do with her. Mother contacted Family Promise and scheduled an intake appointment for August 2, 2011, but failed to show for the appointment. The CHINS petition recommended that Child be placed in foster care until a suitable relative could be found.

On September 2, 2011, the juvenile court held a dispositional hearing, at which it ordered Mother to participate in reunification services, officially removed Child from Mother's care, and granted wardship to DCS. The juvenile court also ordered Mother to, *inter alia*, obtain and maintain suitable housing, remain drug- and alcohol-free, submit to random drug screens, obtain a legal and stable source of income, participate in home-based case management services and follow all recommendations, participate in visitation, complete a mental health evaluation and follow all recommendations, and participate in Reflections Group at the YWCA. On June 14, 2013, Mother pled guilty to Class D felony possession of a controlled substance, with the trial court withholding judgment.

On February 8, 2013, the juvenile court changed Child's permanency plan from

3

reunification to adoption and authorized the initiation of termination proceedings. On May 13, 2013, DCS filed its TPR petition. On August 9, 2013, the juvenile court held a hearing on the TPR petition. During the hearing, the juvenile court heard evidence relating to Mother's mental health, instability, poor decision-making, and noncompliance with services and to Child's best interests.

### Mother's History of Mental Health Issues

In April of 2011, Mother attempted suicide and was hospitalized. Mother was hospitalized again from June 3 to 8, 2012, for mental health issues and was again suicidal. Mother's history of mental health issues, either diagnosed or self-reported, includes depression, bipolar disorder, split personality, anxiety, learning disability, ADHD, auditory hallucinations, physical and sexual abuse as a child, below-average intellectual functioning, major depression-recurrent-severe without psychotic symptoms, posttraumatic stress disorder, major depressive disorder with psychosis, and major depressive order-recurrent-moderate. In November of 2012, Mother admitted herself to a psychiatric ward because she could not control her anger after learning that Child's plan was changed to adoption. Mother has been prescribed medication to address some of her mental health issues but is often noncompliant with treatment.

### Instability

Mother was evicted from housing in March and November of 2009. At the initiation of the CHINS proceeding in August of 2011, Mother and Child were homeless, had been homeless for approximately one year, and could not immediately be located for assessment.

4

At various times, Mother lived with a fifty-year-old man who was a "family friend," various other friends, and her maternal great aunt. Mother had obtained housing through the Seeds of Hope Program but was asked to leave after one month for violating the rules. At the time of the termination hearing in August of 2013, Mother was living with family friends "Grandma Kathy" Graham and her husband.

Mother was homeless off-and-on during the CHINS proceeding. Service providers reported that Mother lived with and requested Child's placement with various persons during the CHINS proceeding; these requests, however, were always denied because Mother's association with those persons was temporary and the service providers were uncomfortable placing Child in such situations. Prior to the CHINS proceeding, Mother had never had a job. During the CHINS proceeding, Mother obtained part-time employment at McDonald's but was soon terminated. Mother later worked odd jobs a temporary agency. After Mother's association with the temporary agency ended, she reported that she was searching for employment but failed to provide documentation as requested and did not participate in job coaching. Mother was unemployed at the time of the termination hearing.

### *Poor Decision-Making*

At the beginning of the CHINS case, Mother and Child stayed with a person who manufactured methamphetamine and had stayed with a relative who was a convicted child molester. During the CHINS proceeding, Mother reported that she was involved with a gang and that the gang had required her to get a tattoo. Mother was involved with a man for one month before becoming engaged to him. After that relationship ended, Mother became

5

involved with another man; after one week of involvement with this man, Mother requested that Child be placed with his mother. By the time of the termination hearing, Mother was engaged to a third man and had committed several drug-related crimes with him.

At the time of the termination hearing, mother was living with the Grahams, who provided for all of Mother's needs—a situation service providers believed enabled Mother to not have to make necessary changes. The Grahams provided Mother with alcohol, which she drank to the tune of twelve drinks of hard alcohol per day. Mother was also consuming Xanax. According to Mother, her gang involvement and alcohol use were behind her hospitalization for suicidal thoughts in June of 2012.

### Non-Compliance with Services

Mother's compliance with the services offered to her declined over time. Mother "failed to take advantage of services offered to address her instability, mental health, substance abuse, and parental shortcomings. Mother made minimal effort to seek unemployment or independent housing. Mother was inconsistent with case management and counseling services. Mother was unsuccessfully discharged for non-compliance." Appellant's App. p. 28. Courtney Lashbrook, who works for Child and Family Partners ("CFP") and who provided Mother with case management and visitation services from August of 2011 to March of 2012, testified that Mother lived in four places during Lashbrook's tenure, did not put in a 100% effort in her job search, and did not actively use the services provided to her. According to Lashbrook, Mother's compliance with services declined during her tenure and visitation, which started well but began a consistent decline in

6

September of 2011, with Mother failing to follow through with parenting suggestions.

CFP's Julie Williams took over Mother's case in April of 2012. Williams testified that Mother lost her job early in Williams's tenure, would not follow through with requested documentation of her job search, refused a job coach, and could not obtain stable housing. At one point, Mother was accepted into the Seeds of Hope program, which offered drug treatment and housing. Mother, however, was dismissed from Seeds of Hope after approximately one month for failing to follow its rules. Mother failed to apply parenting suggestions, and approximately 80% of her visits with Child were negative.

Court-Appointed Special Advocate ("CASA") Michelle Harkins reported on July 30, 2013, that she had been monitoring visitation between Mother and Child since January of 2012. CASA Harkins noted that visitation had, at times, gone poorly and that Mother struggled with her medication, providing a stable home, and financial stability. CASA Harkins opined that Mother was unable to provide a stable home or provide for Child without help from others. Mother's visitation with Child ended in November of 2012.

### Child's Best Interests

During the CHINS proceeding, Child underwent an early mental health screen, the report from which was issued on January 13, 2012. The report recommended that Child participate in ongoing play therapy. On June 29, 2012, Child was assessed, and when the clinician asked Child about Mother, Child became withdrawn, hid under a desk "curled up in a catatonic position[,]" and stated that he was "very afraid of his mom." DCS Ex. 15 p. 4. In July of 2012, Child began breaking out in hives during visitation, which a physician

7

diagnosed as stress-induced. Moreover, Child exhibited "bathroom problems" in the form of encopresis and enuresis. DCS Ex. 15 p. 41. When visitation with Mother "stopped for many weeks at a time[,]" Child stopped breaking out in hives, the bathroom problems ceased, and he reported fewer nightmares. DCS Ex. 15 p. 41.

Clinical Social Worker Barb Osborn, who had been working with Child since January of 2012, testified that since visitation with Mother had ceased, Child had shown dramatic improvement: he was no longer suffering from hives, there were no more toilet accidents, and his play was calm instead of agitated. Social Worker Osborn feared that reunification with Mother would result in Child needing treatment for anxiety. On July 23, 2013, Wabash Valley Alliance Outpatient Case Manager Brittany Atkinson, who had been working with Child since October of 2012, reported that Child "seem[ed] to be flourishing in his foster home environment [and was] stable and secure." DCS Ex. 15 p. 41. Case Manager Atkinson recommended that Mother's parental rights be terminated and that Child be placed for adoption with his current foster mother. *Id*. In her July 30, 2013, report, CASA Harkins opined that termination of Mother's parental rights was in Child's best interests and recommended permanent placement with his foster family.

### *Disposition*

On September 26, 2013, the juvenile court issued its order terminating Mother's and Father's[1] parental rights in Child. The juvenile court order provided, in part, as follows:

The allegation of the petition are true in that: the child has been removed from

---

[1] Father, whose parental rights to Child were terminated in the same proceeding as Mother's, is not participating in this appeal.

his parent(s) for at least six (6) months under a dispositional decree of this Court[.] There is a reasonable probability that the conditions resulting in the removal or reasons for placement outside the parents' home will not be remedied.

There is a reasonable probability that the continuation of the parent-child relationship will pose a threat to the well-being of the child.

It is in the best interest of the child that the parent-child relationship be terminated.

The Tippecanoe County [DCS] has a satisfactory plan for the care and treatment of the child which is adoption.

Appellant's App. p. 26.

## DISCUSSION AND DECISION

The Fourteenth Amendment to the United States Constitution protects the traditional rights of a parent to establish a home and raise her children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical

9

development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Specifically, Mother claims that (1) DCS failed to establish that the conditions that resulted in Child's removal or the reasons for his placement outside of her care will not be remedied, (2) continuation of the parent-child relationship poses a threat to the well-being of Child, and (3) termination is in Child's best interests. We note that Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, so the juvenile court need only find *either* that the conditions resulting in removal will not likely be remedied or that the continuation of the parent-child relationship poses a threat to the child. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied.* Thus, if we find Mother's first

11

contention to be unavailing, we need only address it and the juvenile court's finding that termination is in Child's best interests.

## A. The Conditions that Led to Child's Removal Are Unlikely to Be Remedied

In order to determine that the conditions that led to Child being removed from Mother's care will not be remedied, the juvenile court should first determine what conditions led DCS to place Child outside of Mother's care, and, second, whether there is a reasonable probability that those conditions will not be remedied. *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside his parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)).

Mother points to her relatively long-term stay in the Grahams' home and suggests that it undermines the juvenile court's conclusion that she is unable to provide appropriate

housing for Child. In other words, Mother is arguing that her housing instability, which she also seems to argue was the main reason for Child's removal, has already been remedied. As an initial matter, Mother's inability to obtain suitable housing is far from the only reason cited by the juvenile court in its order terminating her parental rights. In addition to findings related to Mother's inability to find suitable housing, the juvenile court made specific findings relating to Mother's inability to maintain stable employment, significant mental health issues, hospitalizations for those mental health issues, poor judgment related to relationships, criminal activity, her excessive alcohol and Xanax use, and failure to take advantage of services. Mother challenges none of these findings.

In any event, we cannot say that the record unambiguously supports a finding that Mother's housing instability issues have been resolved in any sense. At most, the record establishes that Mother has found housing that, even if suitable, is dependent entirely upon the Grahams' good will, as Mother concedes that she contributes nothing to her situation. Finally, there is evidence in the record that the Grahams' residence may not be at all suitable for Child. Mother herself reported that the Grahams provided with her with alcohol, which she drank to excess, and that she consumed Xanax while at the Grahams' residence. Mother has not established that the juvenile court's conclusion that the conditions that led to Child's removal from her care are unlikely to be remedied is clearly erroneous.

### B. Child's Best Interests

Mother challenges the juvenile court's conclusion that termination of her parental rights is in Child's best interests.

13

We are mindful that in determining what is in the best interests of the children, the court is required to look beyond the factors identified by the office of family and children, and look to the totality of the evidence. In so doing, the trial court must subordinate the interests of the parents to those of the children. The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. In addition, this court has previously determined that the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests.

*Id.* at 203 (citations omitted).

We conclude that the totality of the evidence supports the juvenile court's determination that termination of Mother's parental rights is in Child's best interests. As previously mentioned, the record supports the juvenile court's conclusion that the many conditions that led to Child's removal are unlikely to be remedied. Moreover, there is substantial evidence that Child's relationship with Mother has deteriorated to the point where its continuation is a threat to Child's health. During the CHINS proceeding, Child was assessed, and when the clinician asked Child about Mother, Child became withdrawn, hid under a desk "curled up in a catatonic position[,]" and stated that he was "very afraid of his mom." DCS Ex. 15 p. 4. In July of 2012, Child began breaking out in hives during visitation, which a physician diagnosed as stress-induced. Moreover, Child exhibited "bathroom problems" in the form of encopresis and enuresis. DCS Ex. 15 p. 41. When visitation with Mother ceased, Child stopped breaking out in hives, the bathroom problems ceased, and he reported fewer nightmares. Social Worker Osborn feared that reunification with Mother would result in Child needing treatment for anxiety.

Additionally, there is evidence that Child's current placement with a foster mother

who plans to adopt him is favorable. Case Manager Atkinson reported that Child "seem[ed] to be flourishing in his foster home environment [and was] stable and secure." DCS Ex. 15 p. 41. Social Worker Osborn testified that Child already viewed his foster mother as his "mommy." Finally, at least two witnesses who worked with Child testified on his behalf that termination is in his best interests. Case Manager Atkinson recommended that Mother's parental rights be terminated and that Child be placed for adoption with his current foster mother, and CASA Harkins opined that termination of Mother's parental rights was in Child's best interests and recommended permanent placement with his foster family. Mother's argument amounts to an invitation to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

The judgment of the juvenile court is affirmed.

KIRSCH, J., and MAY, J., concur.