## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 10 2018, 10:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel J. Vanderpool
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Patricia C. McMath
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of The Termination of the Parent-Child Relationship of:

C.S. (Minor Child)

and

B.S. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

October 10, 2018

Court of Appeals Case No. 18A-JT-1062

Appeal from the Wabash Circuit Court

The Honorable Robert R. McCallen, III, Judge

Trial Court Cause No. 85C01-1710-JT-21

**Altice, Judge.**

## Case Summary

B.S. (Mother) appeals the involuntary termination of her parental rights to her daughter, C.S. (Child).[1] Mother's sole argument on appeal is that the Indiana Department of Child Services (DCS) failed to present sufficient evidence that termination of her parental rights is in Child's best interests.

We affirm.

## Facts & Procedural History

Mother gave birth to Child on January 8, 2016. DCS intervened at the hospital because Mother tested positive for amphetamine. When interviewed by a DCS family case manager (FCM), Mother indicated that she had been incarcerated in Fulton County Jail from September 19 through November 3, 2015. Mother admitted that she had used heroin while pregnant prior to her incarceration and that after her release, she used controlled substances that she obtained on the

---

[1] Father's parental rights were also terminated, but he does not participate in this appeal.

street. Child was removed from Mother's care at the hospital and has remained in relative placement since that time with Child's great aunt (Aunt).

[4] On January 12, 2016, DCS filed a petition alleging Child to be a child in need of services (CHINS). At the CHINS hearing, Mother admitted the allegations and Child was so adjudicated on March 31, 2016. Following a dispositional hearing on April 15, 2016, the trial court entered a dispositional order directing Mother to, among other things, participate in supervised visits, maintain weekly contact with the FCM, complete a substance abuse assessment and follow all treatment recommendations, and submit to random drug and alcohol screens.

[5] Mother visited with Child once or twice a week and engaged in services through DCS for about three months following Child's birth. She participated in Moral Reconation Therapy (MRT therapy) and substance abuse counseling "on and off" through the Bowen Center. *Transcript* at 22. During supervised visits, Mother was loving and appropriate with Child. Mother's participation in services, however, ended in April 2016 as a result of another incarceration. Child was three months old at the time. Mother spent the rest of 2016 in and out of jail. She did not maintain communication with the FCM, participate in services, or visit Child. Mother acknowledged that during this time she was using meth, heroin, pills, and "pretty much anything." *Id.* at 37.

[6] In February 2017, Mother contacted FCM Alicia Lopez to start services again. Mother participated in an intake evaluation at the Bowen Center and restarted supervised visitation. The Bowen Center recommended forty sessions,

including group and individual therapy. Mother did not participate in any of the recommended sessions. As a result, visitation was suspended in March.

[7] Shortly thereafter, Mother was arrested in Fulton County and remained in jail until November 8, 2017, when she entered court-ordered treatment with the Women's Journey Substance Abuse Treatment Program at the YWCA in South Bend. Mother participated in individual counseling, group counseling, and Narcotic's Anonymous meetings, as well as random drug screens. She, however, did not complete the inpatient program or start the year-long aftercare program.

[8] Mother left the YWCA on December 24, 2017, on a two-day pass for Christmas. She had a supervised visit with Child on Christmas day. Mother did not return to the YWCA as scheduled, despite the fact that she knew this would result in the violation of her probation. Instead, Mother returned to using drugs. She had no further visits with Child and did not participate in any other services. Then, in early February 2018, Mother overdosed on heroin in Wabash County and was arrested following her hospital stay. Mother was charged, in Wabash County, with three Level 6 felonies and one Class A misdemeanor, all drug-related charges. Additionally, a petition to revoke probation was filed in Fulton County.

[9] In the meantime, on October 20, 2017, DCS filed the instant petition to terminate Mother's parental rights. On April 4, 2018, the trial court held a factfinding hearing in the termination case. FCM Lopez, Mother, and Aunt

testified. Mother remained incarcerated at the time of the hearing, with both criminal causes pending. Mother testified that she had been participating in MRT and substance abuse services for about four to five weeks in jail. Aunt indicated that she wishes to adopt Child, whom she has cared for since Child was four days old. FCM Lopez recommended termination of the parent-child relationship, as Child had been removed for over two years and Mother had not remedied her substance abuse issues or been consistent with services.

[10] After the hearing, the trial court issued its order involuntarily terminating Mother's parental rights. The order contained the following relevant findings:

> At no time has reunification, while the goal, been seriously considered.
>
> [Mother] has been in and out of jail both prior to [Child's] birth and after [Child's] birth. Her incarceration has seriously hampered her ability to engage in any of the Court ordered services. However, even when she has not been incarcerated, she has made no substantive progress toward reunification.
>
> She was court ordered into a treatment program at the YWCA in South Bend, Indiana, in November of 2017. She obtained a pass to go home for the Christmas holiday. During that holiday she had one visit with [Child] for a few hours. [Mother] violated the terms of her pass by failing to timely return to the program. She made virtually no effort to return to that program. She engaged in no services or further visits with [Child]. Instead, she returned to her old ways. In early February of this year, she overdosed on heroin and was taken to the hospital. Following her release from the hospital she was arrested on an outstanding warrant, which she knew about. She remains in jail to this day. She is unsure of when her current incarceration will end.

While incarcerated, [Mother] appears motivated to seek out and participate in programming. When not incarcerated, she is not. She cannot parent when she is incarcerated. Her history is a good predictor of her future. She cannot care for herself or [Child].

***

[Child] has never lived with [Mother].

The evidence is clear and convincing that continuation of the parent-child relationship is not in [Child's] best interests....

At no time during the pendency of this action has reunification been considered because of [Mother's] failure to make any recognizable or substantive progress. Reunification was the goal, and it was pursued, to no avail.

[Child] is in a placement that seeks to adopt her. She is doing well in that placement. DCS's plan for [Child] is adoption.

*Appellant's Appendix* at 9-10. Based on its findings, the trial court concluded that Child had been removed from Mother's care for a period of at least six months under a dispositional decree, there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, termination is in Child's best interests, and DCS has a satisfactory plan for Child's care and treatment following termination. Mother now appeals, challenging only the trial court's determination regarding Child's best interests.

## Discussion & Decision

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App.

2008).  In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination.  *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).  The purpose of terminating parental rights is not to punish the parents, but to protect their children.  *Id.*

[14]  As set forth above, Mother challenges only the trial court's determination regarding Child's best interests.  Ind. Code § 31-35-2-4(b)(2)(C) requires DCS to allege and prove by clear and convincing evidence that termination is in the best interests of the child.  In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence.  *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013).  In so doing, the trial court must subordinate the interests of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship.  *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).  Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child."  *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).  "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests."  *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[15] Mother takes issue with the trial court's findings that she does not appear motivated to seek out and participate in treatment when she is not incarcerated. To dispute this finding, Mother directs us to evidence that she complied with services for the first three months of Child's life (January 2016 to early April 2016) and then engaged in supervised visitation and an intake evaluation in February 2017. The termination hearing, however, took place in April 2018, when Child was over two years old and two months after Mother had overdosed on heroin. Although Mother was incarcerated much of Child's life, she was out of jail off and on from August 2016 through the spring of 2017. During this time, she cooperated with the DCS for only about a month. Further, after she violated probation by failing to return to the YWCA, Mother was not incarcerated from Christmas 2017 through early February 2018. Instead of engaging in services and visiting Child, Mother returned to her life of drugs and eventually overdosed. In light of the totality of the evidence, the trial court's finding regarding Mother's lack of motivation to seek treatment for her drug addiction is not clearly erroneous.

[16] Nonetheless, Mother attempts to liken this case to *G.Y.*, 904 N.E.2d 1257, in which our Supreme Court determined that the evidence did not clearly and convincingly establish that termination was in the child's best interests. The mother in that case had cared for her child for the first twenty months of the child's life. There were no allegations that the mother had engaged in any criminal behavior after the child's birth, and the mother had been a fit parent during the time she cared for her child. The mother became incarcerated when

the child was twenty months old for a crime she committed before the child's conception. While incarcerated, the mother "took positive steps and made a good-faith effort to better herself as a person and as a parent." *Id*. at 1262. Specifically, she completed an eight-week drug rehabilitation program and a fifteen-week parenting class. She also actively participated in an employment readiness program and had nearly completed her associates degree, which would move her projected release date up by about a year. In addition to making "a good-faith effort to complete the required services available to her in prison", the mother had obtained suitable housing and gainful employment upon her release from prison, which was imminent. *Id*. at 1263. Finally, the Court observed that "since her incarceration Mother has maintained a consistent, positive relationship with G.Y." *Id*. at 1264. In sum, the mother had demonstrated a "commitment to reunification with G.Y. from the very point of her arrest." *Id*. at 1265.

[17] Unlike the mother in *G.Y.*, Mother has not demonstrated an ongoing commitment to doing what is necessary to gain custody of Child. Out of the twenty-seven months Child had been alive at the time of the termination hearing, Mother had exercised supervised visits with her for only about four months, just one of which was during the last two years. During the majority of this time, Mother was either incarcerated or continued to use drugs, including overdosing on heroin and being arrested two months before the termination hearing. Mother never completed a drug treatment program, despite ample opportunities. Further, it is unknown how long she will remain

incarcerated on her pending felony charges and probation violation. In sum, Mother has made no real, sustained progress toward addressing her substance abuse issues, staying out of jail, and working toward reunification.

[18] We do not doubt that Mother loves Child and wishes to parent her. Mother's pattern of behavior prior to and after Child's birth, however, reveals that she is not able to care for herself, let alone Child. Child has lived with Aunt since she was four days old and has done well in that placement. Aunt wishes to adopt Child. FCM Lopez opined that termination and adoption by Aunt were in Child's best interests. After more than two years and little to no progress by Mother, Child deserves permanency now. The trial court's conclusion that termination is in Child's best interests is supported by the findings and not clearly erroneous.

[19] Judgment affirmed.

Brown, J. and Tavitas, J., concur.