FILED

Jun 28 2023, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Jeffrey A. Flores
Flores Law Office
Madison, Indiana

ATTORNEY FOR APPELLEE

William Joseph Jenner
Jenner, Pattison & Sharpe
Madison, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Jonathon D. Simpson,

*Appellant-Defendant*

v.

City of Madison, Indiana,

*Appellee-Plaintiff.*

June 28, 2023

Court of Appeals Case No.
22A-MI-246

Appeal from the Jefferson Superior
Court

The Honorable Michael J.
Hensley, Special Judge

Trial Court Cause No.
39D01-2002-MI-183

**Opinion by Judge Pyle**

Senior Judge Robb and Judge Weissmann concur.

**Pyle, Judge.**

## Statement of the Case

[1] Jonathon D. Simpson ("Simpson") appeals the trial court's order upholding the City of Madison's ("City") Police Merit Board Commission's ("Merit Board") decision to terminate Simpson's employment with the Madison Police Department ("MPD"). Simpson argues that the trial court erred by upholding the Merit Board's decision to terminate his employment. Concluding that the trial court did not err, we affirm the trial court's judgment.

[2] We affirm.

## Issue

> Whether the trial court erred by upholding the Merit Board's decision to terminate Simpson's employment.

## Facts[1]

[3] In 2004, Simpson started working for MPD as an officer. Simpson later became a lieutenant detective. In 2006, the Indiana State Police ("ISP")

---

[1] We note that Simpson has provided minimal record materials for our review in this appeal. Specifically, in his Appellant's Appendix, Simpson included only the chronological case summary ("CCS") and the orders from Merit Board and trial court. He did not include any pleadings that had been filed with the Merit Board or the trial court. We direct Simpson's attention to Indiana Appellate Rule 50(A)(1), which provides that the "purpose of an Appendix in civil appeals and appeals from Administrative Agencies is to present our Court with copies of only those parts of the Record on Appeal that are necessary for the Court to decide the issues presented." Additionally, we direct Simpson to Appellate Rule 50(A)(2)(f), which provides that an Appellant's Appendix "shall contain[,]" among other things, "pleadings and documents from the Clerk's Record in chronological order that are necessary for the resolution of the issues raised on appeal[.]" We also note that Simpson failed to comply with Appellate Rule 22(C), which provides that "[a]ny record material cited in an appellate brief must be reproduced in an Appendix or Transcript or exhibits." The City has included, in its Appellee's Appendix, the relevant pleadings filed with the Merit Board along with the transcript and exhibits from the Merit Board hearings. Neither party, however, has included the pleadings

investigated Simpson regarding an allegation of improper relationships with various people potentially involved in criminal investigations or cases. Two of the questioned relationships included Carrie Brown ("Brown") and Misty Owens ("Owens"). In February 2006, Simpson admitted to then MPD police chief, Chief Robert Wolf ("Chief Wolf"), that he had engaged in a sexual relationship with Brown in 2002 and 2005 and that he had desired to have a sexual relationship with Owens. At that time, Chief Wolf gave Simpson a written informal reprimand for conduct unbecoming an officer.

[4] In 2013, ISP conducted a second investigation relating to Simpson. This investigation related to Simpson's evidence handling and packaging. Specifically, Simpson had had evidence, including drugs and drug paraphernalia, in his office, and he had not packaged, sealed, or placed that evidence in the MPD evidence locker. Then MPD police chief, Chief Dan Thurston ("Chief Thurston") spoke to Simpson and gave him a verbal reprimand about proper evidence practices and instructed Simpson to "follow the proper chain of collecting evidence, packaging evidence, and logging evidence." (Appellee's App. Vol. 4 at 223).

[5] Sometime between 2011-2013, then Jefferson County Prosecutor Chad Lewis ("Prosecutor Lewis") heard rumors about Simpson and asked Simpson whether

filed with the trial court on judicial review. For example, neither party's appendix contains the briefs filed by Simpson and the City in support of their arguments on judicial review.

he was having a sexual relationship with any defendants, confidential informants, or witnesses in then-pending cases. Simpson denied being engaged in any such relationship.

[6] In October 2016, Simpson was conducting surveillance in an area where Brown was in a car with Demontre Jones ("Jones") and Tracie Pedraza ("Pedraza") ("the Jones/Pedraza investigation"). Simpson found drugs in the car and arrested Jones and Pedraza. Simpson did not arrest Brown. Simpson wrote the probable cause affidavit, which mentioned Brown's presence at the scene. Simpson did not inform Prosecutor Lewis, who was the prosecutor at that time, about his prior sexual relationship with Brown. The prosecutor's office brought charges against Jones and Pedraza and obtained convictions against them.

[7] In December 2017, Simpson searched the residence of James Wainman ("Wainman"), who was a convicted felon ("the Wainman investigation"). During the search of Wainman's residence, Simpson recovered methamphetamine, two guns, drug paraphernalia, and scales. Simpson collected the evidence but made no arrests. Jefferson County Sheriff Deputy Ben Flint ("Deputy Flint") and ISP Trooper Andrew Garrett ("Trooper Garrett") were also on the scene as Simpson searched the house. While on the scene, Deputy Flint and Trooper Garrett expressed concern about Simpson's actions during the search. As Simpson was searching the house, Trooper Garrett went to his vehicle and radioed his sergeant to express his concerns. The ISP sergeant told Trooper Garrett to stay on the scene and document his observations. After Deputy Flint had left the scene, he sent an email to his

superior officer to set out his concerns about Simpson's search at the Wainman residence.

[8] Simpson waited more than six months before he logged the evidence from the Wainman investigation into the MPD's evidence system. Additionally, Simpson did not submit an investigation report to MPD's case report system. Nor did Simpson send a report to the prosecutor's office. As a result, the prosecutor's office did not file any charges relating to the Wainman investigation. About a month after Simpson had logged the evidence into MPD's evidence tracking system, he filed a system request to have an item of the evidence collected from the Wainman investigation be "destroyed . . . for no charges filed." (Appellee's App. Vol. 2 at 86, Vol. 4 at 147). Specifically, Simpson sought to destroy eight "individual plastic bags each weighing .5 grams to 1 gram[.]" (Appellee's App. Vol. 4 at 144). This evidence, however, was not destroyed.

[9] The ISP commenced a third investigation of Simpson in 2017 ("the 2017 ISP investigation"). Trooper Tracy Rohlfing ("Trooper Rohlfing") conducted the investigation. This third investigation related in part to Simpson's actions in the Wainman investigation. The ISP investigation also looked into the Jones/Pedraza investigation and Simpson's failure to report his previous sexual relationship with Brown to the prosecutor. Trooper Rohlfing interviewed Simpson and other witnesses, including Brown and Owens, during this investigation. When Trooper Rohlfing interviewed Simpson, Simpson

indicated that he had up to fourteen other cases or reports that he had not logged.

[10] Trooper Rohlfing later went to the MPD station in 2018 and discussed the 2017 ISP investigation with MPD Chief Jeremy Perkins ("Chief Perkins"). At that time, Chief Perkins learned of the Wainman investigation and Simpson's prior problems with evidentiary practices. Chief Perkins searched the MPD case report system for a report on the Wainman investigation, but no report existed. Chief Perkins later placed Simpson on administrative leave. The ISP later transferred out and took control of the evidence from the Wainman investigation.

[11] On March 15, 2019, Jefferson County Prosecutor David Sutter ("Prosecutor Sutter") asked to meet with Chief Perkins. During that meeting, Prosecutor Sutter informed Chief Perkins that the prosecutor's office had decided to no longer accept cases filed by Simpson. Prosecutor Sutter also gave Chief Perkins a letter ("March 2019 Prosecutor Letter") that indicated that decision. The letter provided, in relevant part, as follows:

> I have received and reviewed two police reports from the Indiana State Police; 17ISPC013857 and 13ISPC007678. Both reports involve City of Madison Police Department Lieutenant Detective Jonathon Simpson. The reports contain allegations that bear directly on Lieutenant Detective Simpson's truthfulness. Additionally, there is concerning information contained in the reports regarding evidence handling practices in cases that Lieutenant Detective Simpson investigated.

> The Indiana Rules of Professional Responsibility and the United States Supreme Court cases of *Brady v. Maryland* and *U.S. v. Giglio* [sic] require me to disclose any information about character for untruthfulness for any State's witnesses. All exculpatory evidence that is material to guilt or punishment must be produced to a defendant or defense attorney including impeachment evidence of government witnesses. I am providing disclosure of the allegations contained in the above referenced police reports to any defendant or defense attorney who has a case where Lieutenant Detective Jonathon Simpson is a witness or affiant pursuant to *Brady v. Maryland* and *U.S. v. Giglio* [sic].
>
> Based on the allegations contained in the reports, the Jefferson Prosecutor's Office will not call Lieutenant Detective Jonathon Simpson as [a] witness and will not accept cases where he has had any involvement.

(Appellee's App. Vol. 4 at 34).

[12] On May 16, 2019, Chief Perkins referred charges to the Merit Board and against Simpson for "Neglect of Duty, Violation of Department Rules and Practices, and . . . conduct . . . unbecoming an officer." (Appellee's App. Vol. 2 at 6). The charges against Simpson ultimately involved: (1) Simpson's conduct in the Wainman investigation, including Simpson's failure to timely and properly log evidence and submit a report; and (2) Simpson's failure to inform prosecutors of his past sexual relationships with individuals who were the subjects of or involved with a case or an investigation. Chief Perkins alleged that Simpson had violated Standard Operating Procedure number eight ("SOP-008") as well as rules of conduct from the Police Merit Board Handbook, including Article III(E)(1), Article III(E)(40), and Article III(E)(41).

Chief Perkins alleged, in part, that Simpson had violated Standard Operating Procedure number eight ("SOP-008"). SOP-008 is the MPD standard operating procedure relating to "evidence and property control[,]" and it "[e]stablishe[d] guidelines for collecting, preserving and transporting physical evidence from a crime scene for analysis or storage." (Appellee's App. Vol. 4 at 225, 238). SOP-008 provided, among other things, that MPD employees were required to properly record all evidence into the department's evidence system.

Chief Perkins also alleged that Simpson had violated the rules of conduct from the Police Merit Board Handbook, including Article III(E)(1), Article III(E)(40), and Article III(E)(41). Police Merit Board Handbook Article III(E)(1) is the provision that relates to conduct unbecoming an officer. It provides, in part, that "[c]onduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon any member, or that which impairs the operation or efficiency of the Department or its members." (Appellee's App. Vol. 4 at 193). This provision also explains that conduct unbecoming an officer may include, among other things, "[k]nowingly withholding information from the Department, the prosecuting attorney, or any court in which the officer is a witness[.]" (Appellee's App. Vol. 4 at 193).

Police Merit Board Handbook Articles III(E)(40) and (41) provide as follows:

> (40) <u>Departmental Reports.</u> Members shall submit all necessary reports on time and in accordance with established departmental procedure. Reports submitted by members shall be truthful and

complete, and no member shall knowingly enter or cause to be entered any inaccurate, false or improper information, or withhold information from the Prosecuting Attorney or from any court.

(41) Processing Property and Evidence.  Property or evidence which has been discovered, gathered or received in connection with departmental responsibilities will be processed in accordance with established departmental procedure.  Members shall not convert to their own use, manufacture, conceal, falsify, destroy, remove, tamper with or withhold any property or evidence in connection with an investigation or other police action, except in accordance with established departmental procedure.

(Appellee's App. Vol. 4 at 202-03).

[16]  Chief Perkins requested that the Merit Board terminate Simpson's employment with MPD.  That same day, Chief Perkins notified Simpson of the pending disciplinary action and charges against him as well as his right to request a hearing before the Merit Board.

[17]  The Merit Board held a hearing in November 2019 and January 2020.  At the beginning of the hearing, the parties agreed that all procedural matters for the hearing were proper.  The hearing officer explained that the hearing would "not follow strict evidentiary rules" and that "hearsay w[ould] be allowed." (Tr. Vol. 2 at 66).  Additionally, the parties submitted a stipulated agreement regarding Simpson's motion in limine, in which he had sought to exclude any evidence or reference to any prior disciplinary actions against or investigations of him.  The parties' stipulation provided that the parties had "agree[d] that

witnesses may be questioned regarding previous reprimands of Officer Simpson so long as it relates to the specific allegations contained herein against Officer Simpson." (Appellee's App. Vol. 2 at 51, 67).

[18] During the hearing, both the City and Simpson called witnesses. The City called Chief Perkins, Trooper Rohlfing, Prosecutor Chad Lewis, Deputy Ben Flint, Trooper Garrett, Chief Thurston, and Chief Wolf, who testified to the facts as set forth above. Simpson testified and called numerous witnesses, including Brown and Owens. Simpson also called some former and current police officers to testify about evidence and report writing practices.

[19] The parties entered joint exhibits, including the Police Merit Board Handbook and SOP-008. The City and Simpson also entered their own exhibits. Among the City's exhibits were Exhibit C-1, the March 2019 Prosecutor letter, and Exhibit C-2, the 2017 ISP investigation report. The City introduced these two exhibits during Chief Perkins' testimony. Simpson objected to both exhibits based on foundation. Specifically, Simpson argued that the City should not be able to introduce the exhibits through Chief Perkins because Chief Perkins had not written the letter or the ISP report. The hearing officer overruled Simpson's objections and admitted the exhibits into evidence.

[20] Despite objecting to the admission of Exhibits C-1 and C-2, Simpson's counsel questioned witnesses about the content of these two exhibits. For example, Simpson's counsel questioned Chief Perkins and Trooper Rohlfing on cross-examination about Exhibit C-1 and its contents. Specifically, Simpson's

counsel pointed out that Exhibit C-1 had mentioned that the ISP report had contained allegations regarding Simpson's truthfulness. During Simpson's testimony, Simpson's counsel also asked Simpson about Exhibit C-1, including the specific contents of the letter. Specifically, Simpson's counsel asked Simpson, "[W]hat does [the letter] basically say?" (Appellee's App. Vol. 3 at 181). Simpson then summarized the content of the letter. Moreover, Simpson's counsel also questioned Trooper Rohlfing, who had authored the 2017 ISP investigation report, about Exhibit C-2 and his investigation as set forth in Exhibit C-2.

[21] During the hearing, various witnesses testified about Simpson's conduct in the Wainman investigation, including Simpson's failure to timely and properly log evidence and submit a report. Chief Perkins testified that Simpson had violated SOP-008 and multiple rules of conduct as set out in the Police Merit Board Handbook. Specifically, Chief Perkins testified that the Wainman investigation had been compromised by Simpson's actions, including his failure to timely log evidence. Chief Perkins also testified that Simpson had violated the rules of conduct in Article III(E)(40) and (41) of the Police Merit Board Handbook by failing to complete a report in the Wainman investigation.

[22] The City also presented testimony during the hearing to address Simpson's failure to inform prosecutors of his past sexual relationships with individuals who were the subjects of or involved with a case or an investigation. This testimony focused mainly on the Jones/Pedraza investigation and Simpson's

prior sexual relationship with Brown. The City also presented testimony about Simpson's prior relationship with Owens.

[23] Chief Perkins and Prosecutor Lewis testified that Simpson had failed to report his relationship with Brown to prosecutors during the Jones/Pedraza proceedings. Prosecutor Lewis, who was the prosecutor at the time of the Jones/Pedraza investigation, testified that Simpson should have disclosed his relationship with Brown as part of the proceedings against Jones and Pedraza. Trooper Rohlfing testified that law enforcement officers have a "duty to bring forward and provide to the prosecutor any evidence that suggests whatsoever that [a] person may not be guilty." (Appellee's App. Vol. 2 at 158). Chief Perkins testified that Simpson's non-disclosure was a violation of the *Brady* rule and constituted conduct unbecoming an officer under Article III(E)(1)(g) of the Police Merit Board Rules. Additionally, Chief Perkins testified that the ISP had informed him that they had "released [Jones] from prison based on their findings" in the 2017 ISP investigation of Simpson. (Appellee's App. Vol. 2 at 98).

[24] When Simpson testified, he stated that he did not understand why the ISP had "started yelling this Brady concern" during the 2017 ISP investigation. (Appellee's App. Vol. 3 at 164). However, one of Simpson's own witnesses, Tyson Eblen ("Eblen"), who was a former MPD detective from 2004 to 2017, acknowledged during cross-examination that a police officer who had been involved in a past sexual relationship with an individual who was a suspect, arrestee, or witness in a case had a duty to disclose that relationship to the

prosecutor. Eblen testified that it was "important to disclose that information" because "it could border on the line of perhaps exculpatory evidence" and "could indicate that maybe there is a bias there." (Appellee's App. Vol. 3 at 148). Simpson testified that he was aware that the prosecutor's office had modified Jones' and Pedraza's sentences based on Simpson's failure to inform the prosecutor's office about his relationship with Brown. Simpson also testified that he had told a deputy prosecutor, Richard Eppard ("Deputy Prosecutor Eppard"), about his prior sexual relationship with Brown. Simpson did not call Deputy Prosecutor Eppard as a witness.

[25] In regard to Simpson's relationship with Owens, Chief Perkins testified that he believed that Simpson had been involved in a prior sexual relationship with Owens. Trooper Rohlfing testified that, during the 2017 ISP investigation, he had interviewed Owens about her relationship with Simpson. Owens told Trooper Rohlfing that she and Simpson had engaged in a relationship that involved "heavy petting" and kissing. (Appellee's App. Vol. 2 at 159). Owens also told Trooper Rohlfing that there were instances when Simpson had overlooked when she had drugs. Simpson cross-examined Trooper Rohlfing about his level of certainty regarding whether Simpson had had a sexual relationship with Owens. Trooper Rohlfing testified that he could not say for certain because Owens had reported that the two had engaged in a relationship while Simpson had denied it. When Simpson presented Owens as a witness, Owens denied that she had had a sexual relationship with Simpson. Owens further testified that she had lied during her ISP interview and that she was on

drugs during that interview. During Trooper Rohlfing's rebuttal testimony, he testified that Owens showed no signs of intoxication at the time of her ISP interview. Additionally, Trooper Rohlfing testified that he had been informed that Simpson had contacted another person to talk to Owens about her Merit Board hearing testimony.

[26] On January 30, 2020, the Merit Board issued an order terminating Simpson's employment with MPD. Specifically, the Merit Board concluded that Simpson's failure to timely log the evidence from the Wainman investigation and failure to file a report had violated the MPD's SOP-008 and the rules of conduct as set out in Articles III(E)(40) and (41) of the Police Merit Board Handbook. The Merit Board also concluded that these failures had compromised the investigation and future prosecution of any offenses against Wainman. Additionally, the Merit Board concluded that Simpson's failure to disclose his previous intimate relationships with Brown and Owens had jeopardized prosecutions for the prosecutor's office, had violated the rule of conduct in Article III(E)(1)(g) of the Police Merit Board Handbook, and constituted conduct unbecoming of an officer. Additionally, the Merit Board determined that Simpson's failure to disclose his previous relationships had resulted in his violation or had caused the prosecutor's office to violate the *Brady* rule that required "disclosing information of an exculpatory nature to defendants in criminal matters." (App. Vol. 2 at 21).

[27] Thereafter, Simpson filed with the trial court a petition for judicial review of the Merit Board's decision.[2] In October 2021, the trial court held a hearing on Simpson's judicial review petition. During the hearing, Simpson argued that he was deprived "fundamental fairness or due process" because the hearing officer admitted Exhibit C-1 (March 2019 Prosecutor letter) and Exhibit C-2 (2017 ISP investigation report), which he asserted had contained hearsay with "conclusory" assertions and "salacious allegations." (Tr. Vol. 2 at 4, 5, 7). Simpson conceded that the hearing officer had explained that hearsay would be allowed during the Merit Board hearing and acknowledged that it was "commonplace" in administrative hearings for hearsay to be admitted. (Tr. Vol. 2 at 4). He generally argued that the admission of the exhibits prevented the Merit Board from being impartial in its determination. Simpson also argued that the Merit Board had improperly used his 2006 informal reprimand as a basis of his termination and that the Merit Board's finding that he had had a sexual relationship with Owens was not supported by the evidence.

[28] In January 2022, the trial court issued an order upholding the Merit Board's decision to terminate Simpson. The trial court made the following relevant findings to address Simpson's arguments on judicial review:

> 15. [Simpson] was afforded adequate due process as he was represented by counsel at all times of this process and never once

---

[2] Again, the parties' exact arguments to the trial court are not known because the parties, when filing their respective appellate appendices, did not include their briefs or pleadings that they had filed with the trial court on judicial review.

made a claim that the process that the City of Madison Merit Board had violated his due process rights. [Simpson's] counsel accepted the matters at the time of the hearing of the Merit Board as procedurally proper. (Tr. Vol. I p. 6).

16. The 2006 reprimand by then Chief Wolf was not improperly used by the Merit Board as a basis for this termination.

> a.) In 2006, Simpson admitted to then Chief Robert Wolf that he had [had] a sexual relationship with Carrie Brown and desired to have a sexual relationship with Misty Owens. (Tr. Vol I. p. 176).
>
> b.) Simpson was informally reprimanded for his behavior in 2006. (Hrg. Ex. C-2 pp. 32-33).
>
> c.) The Merit Board found that, "by [O]fficer Simpson's failure to disclose his previous relationship with Carrie Brown and Misty Owens he has violated or has caused the Jefferson County Prosecutor's Office to violate, the standards set forth in the case of Brady v. Maryland and U.S. v. Giglio [sic], which relate to the disclosing information of an exculpatory nature to defendants in criminal matters." (Merit Board Decision p. 4).
>
> d.) The fact that Simpson continued to investigate or be involved in investigations that involved Brown and failed to disclose such information regarding his past relationship creates an entirely new action for which Simpson could be reprimanded. (Merit Board Decision p. 3).

17. The admission of Hearing Exhibits C-1 (A letter from Prosecutor David Sutter) and C-2 (2017 State Police investigation) did not constitute fundamental [e]rror.

> a.) Police merit board hearings "are administrative actions which allow for less formality than in civil proceedings before a court and we will not disturb the [merit board's] decision for the lack of promulgated rules of evidence as

long as the hearing was full and fair, before an impartial body and conducted in good faith.". . . .

b.) [T]he admission of incompetent or immaterial evidence will not justify setting aside [an] administrative agency action if there is substantial evidence to support the agency's decision[]. . . .

c.) [Simpson] fails to cite to any case whereby an administrative bodies [sic] decision has been overturned on the bas[i]s of introducing evidence that constituted fundamental error.

d.) The parties agreed and consented that the hearing officer would be the one to rule on the admission of evidence. (Tr. P. 9)  The hearing officer stated at the hearing "we will not follow strict evidentiary rules in the hearing, so hearsay will be allowed."  [(] Tr. P. 7).

e.) The hearing officer admitted both C-1 and C-2.  (Tr. P. 24).

f.) Exhibit C-1 (the letter from Prosecutor David Sutter stating that the Jefferson County Prosecutors office would no longer accept cases involving [O]fficer Simpson) was relevant evidence.

g.) Exhibit C-2 (the 2017 Indiana State Police Investigation) was relevant and although introduced through Chief Perkins, the Trooper who authored the report, Detective Tracy Rohlfing, testified and was available for cross examination regarding the contents of the report.

h.) The vast majority of the facts relied upon by the Merit Board were provided through testimony presented at the hearing.  For example, in addition to exhibit C-1, the Merit Board relied on the testimony of former Prosecutor Chad Lewis who stated that Simpson did not inform him

of a previous sexual relationship with Brown and that Lewis felt that Simpson should have disclosed his previous relationship with Brown when it was learned that Carrie Brown was either a suspect or witness in a criminal case. (Tr. P. 127 and Merit Board Findings of Fact p. 2 and 3).

i.) The Merit Board relied upon substantial evidence when formulating their findings of fact and conclusions of law.

j.) The probative value of Exhibits C-1 and C-2 outweigh any prejudice that may have been caused for [Simpson].

18. The Board['] s Findings of Fact supported by the evidence.

* * * * *

e.) [Simpson] fails to provide the Court with any evidence that illustrates the Merit Board[']s findings are not supported by substantial evidence.

(App. Vol. 2 at 14-16).

[29] Simpson now appeals.

## Decision

[30] Simpson argues that the trial court erred by upholding the Merit Board's decision to terminate his employment. As Simpson argued to the trial court on judicial review, Simpson contends that: (1) his due process rights were violated by the Merit Board hearing process; (2) the Merit Board improperly used his 2006 informal reprimand as a basis for its decision to terminate his employment; (3) the admission of Exhibits C-1 and C-2 resulted in fundamental error; and (4) some of the Merit Board's findings were not supported by substantial evidence. We will review each argument in turn.

"Our review of an administrative action is very limited." *Gray v. Cty. of Starke*, 82 N.E.3d 913, 917 (Ind. Ct. App. 2017), *reh'g denied*, *trans. denied*. We give deference to the expertise of the administrative body, which includes a police merit commission, and will not reverse its discretionary decision absent a showing that the decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.* "An arbitrary and capricious decision, which the challenging party bears the burden of proving, is a decision which is willful and unreasonable, made without any consideration of the facts and in total disregard of the circumstances, and lacks any basis which might lead a reasonable and honest person to the same decision." *Id.* (cleaned up). Furthermore, "[o]ur review is limited to determining whether the administrative body adhered to proper legal procedure and made a finding based upon substantial evidence in accordance with appropriate constitutional and statutory provisions." *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as being adequate to support a conclusion." *Id.* We will neither reweigh the evidence upon review nor substitute our judgment for that of the administrative body. *Id.* "The discipline of police officers is within the province of the executive branch of government, not the judicial branch. For this reason, we will not substitute our judgment for that of the administrative body when no compelling circumstances are present." *Winters v. City of Evansville*, 29 N.E.3d 773, 781 (Ind. Ct. App. 2015) (cleaned up), *trans. denied*.

For Simpson's first argument, he generally argues that his due process rights were violated by the Merit Board hearing process. We recognize that "[t]he

tenure given a police officer 'is a constitutionally protected interest requiring the opportunity for a fair hearing conducted in good faith before a full and impartial body." *Fornelli v. City of Knox*, 902 N.E.2d 889, 893 (Ind. Ct. App. 2009) (cleaned up), *trans. denied*. Simpson, however, has waived this argument because he failed to raise a due process objection in the first instance to the Merit Board. *See Pigg v. State*, 929 N.E.2d 799, 803 (Ind. Ct. App. 2010) (explaining that "[d]ue process rights are subject to waiver, and claims are generally waived if raised for the first time on appeal"), *trans. denied*; *Sedona Dev. Group Inc., v. Merrillville Rd. Ltd. P'ship*, 801 N.E.2d 1274, 1280 (Ind. Ct. App. 2004) ("[A] party may not present an argument or issue to an appellate court unless the party raised that argument or issue to the trial court."); *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) (explaining that a party's failure to raise constitutional due process challenge below waives the issue for appellate review). Waiver notwithstanding, Simpson has failed to show a violation of his due process rights by the hearing process. Indeed, Simpson received notice of the charges against him and his right to a hearing, and he was represented by counsel at the hearing. Moreover, at the beginning of the hearing, the parties agreed that all procedural matters for the hearing were proper.

[33] Second, we address Simpson's assertion that the Merit Board improperly considered his 2006 informal reprimand as a basis for its decision to terminate his employment. During the Merit Board hearing, Simpson and the City stipulated that the parties had "agree[d] that witnesses may be questioned

regarding previous reprimands of Officer Simpson so long as it relates to the specific allegations contained herein against Officer Simpson." (Appellee's App. Vol. 2 at 51, 67). Here, Simpson's 2006 reprimand regarding his previous sexual relationship with Brown related to the specific allegation that he had failed to disclose that relationship to the prosecutor's office during the Jones/Pedraza investigation and proceedings. Indeed, a review of the Merit Board's order reveals that the Merit Board terminated Simpson's employment, in part, based on his failure to disclose his prior sexual relationship with Brown during the Jones/Pedraza investigation and proceedings and not based on the fact that he had previously engaged in a relationship with Brown. Accordingly, we conclude that Simpson's argument on this issue is without merit.

[34] Next, we turn to Simpson's challenge to the admission of Exhibits C-1 and C-2. Simpson asserts that the admission of Exhibits C-1 and C-2 resulted in fundamental error. "The fundamental error doctrine is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Johnson v. Wait*, 947 N.E.2d 951, 959 (Ind. Ct. App. 2011) (cleaned up), *reh'g denied*, *trans. denied*. However, "[w]e have applied the fundamental error doctrine only in limited situations in civil cases." *Id.*

[35] Even assuming that this civil proceeding was one of the limited situations in which the fundamental error doctrine would apply, Simpson has failed to show such error. Simpson acknowledges that he objected, based on foundation, to

the admission of these two exhibits during the Merit Board hearing. On judicial review and on appeal, Simpson argues that the admission of these exhibits constituted fundamental error because they contained hearsay. Simpson, however, recognizes that the hearing officer explained that the Merit Board hearing would "not follow strict evidentiary rules" and that "hearsay w[ould] be allowed." (Tr. Vol. 2 at 66). Simpson also generally argues that the admission of the exhibits resulted in prejudice.

[36] In reviewing this admission of evidence issue, we recognize "that [p]olice merit board hearings are administrative actions which allow for less formality than in civil proceedings before a court and we will not disturb the [merit board's] decision for the lack of promulgated rules of evidence as long as the hearing was full and fair, before an impartial body and conducted in good faith." *Fornelli*, 902 N.E.2d at 894 (cleaned up). Indeed, "it is well settled that the admission of incompetent or immaterial evidence will not justify setting aside administrative agency action if there is substantial evidence to support the agency's decision." *Sullivan v. City of Evansville*, 728 N.E.2d 182, 194 (Ind. Ct. App. 2000). "[I]n the absence of a demonstration of actual bias, we will not interfere with the administrative process." *Jandura v. Town of Schererville*, 937 N.E.2d 814, 819 (Ind. Ct. App. 2010) (cleaned up), *trans. denied*. Instead, we presume that an administrative board or panel . . . act[ed] properly and without bias or prejudice." *Id.* (cleaned up).

[37] Here, Simpson objected to Exhibits C-1 and C-2 based on foundation. Thus, his objection to the admission of the exhibits was not based on the content of

the exhibits but on the method through which they were introduced into evidence. Witnesses testified to the content of Exhibit C-1 and to the portions of Exhibit C-2 that were specifically related to the preferred charges against Simpson, and Simpson did not object to that testimony. Moreover, Simpson's counsel questioned witnesses about the content of these two exhibits. Additionally, Simpson's counsel also questioned Trooper Rohlfing, who had authored the 2017 ISP investigation report, about Exhibit C-2 and his investigation as set forth in Exhibit C-2. Because we presume that the Merit Board acted without prejudice and a review of the Merit Board's order reveals that its conclusions regarding the preferred charges were supported by substantial evidence, we reject Simpson's argument that the Merit Board's decision should be reversed based on the admission of the two exhibits. *See Jandura*, 937 N.E.2d at 819 (explaining that we presume that an administrative board acted properly and without bias or prejudice); *Sullivan*, 728 N.E.2d at 194 (explaining that even the improper admission of evidence in an administrative hearing "will not justify setting aside administrative agency action if there is substantial evidence to support the agency's decision").

[38] Lastly, we also reject Simpson's argument that some of the Merit Board's findings were not supported by substantial evidence. "Substantial evidence is such relevant evidence as a reasonable mind might accept as being adequate to support a conclusion." *Gray*, 82 N.E.3d at 917. We will neither reweigh the evidence upon review nor substitute our judgment for that of the administrative body. *Id.* Additionally, "we will not substitute our judgment for that of the

administrative body when no compelling circumstances are present." *Winters*, 29 N.E.3d at 781 (cleaned up).

[39] We have thoroughly reviewed the findings that Simpson challenges. For example, Simpson argues that the Merit Board did not consider the testimony of his witnesses because the findings did not specifically mention his witnesses. However, the Merit Board's order specifically states that it "considered the testimony of all witnesses in making its decision." (App. Vol. 2 at 18). Simpson also challenges the Merit Board's finding that he had had a relationship with Owens and points to the conflicting evidence presented during the hearing. However, such an argument is nothing more than a request for us to reweigh the evidence, which we will not do. *See Gray*, 82 N.E.3d at 917 (explaining that we will neither reweigh the evidence upon review nor substitute our judgment for that of the administrative body).[3] We will not individually discuss each of the findings that Simpson challenges because a review of each one reveals that Simpson's challenges are nothing more than a request for us to reweigh the evidence. Accordingly, we reject Simpson's challenge to the findings and affirm the trial court's order upholding the Merit Board's decision to terminate Simpson's employment with MPD.

---

[3] Moreover, it is clear from our review of the Merit Board proceedings and order that the primary evidence relating to the preferred charge regarding Simpson's failure to disclose his prior sexual relationship was the evidence relating to Simpson's relationship with Brown and his failure to disclose that relationship during the Jones/Pedraza investigation and proceedings.

Affirmed.

Robb, S.J., and Weissmann, J., concur.